# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

═══════════════
## NO. 03-05-00031-CV
═══════════════

**Texas Department of Assistive and Rehabilitative Services, successor in interest to the former Texas Rehabilitation Commission, Appellant**

**v.**

**Richard Howard, Appellee**

═══════════════════════════════════════════════════════════════════
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. GN200245, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING
═══════════════════════════════════════════════════════════════════

## O P I N I O N

The State of Texas elevates public employees who report legal wrongdoing to a protected status as a matter of fundamental policy. The State views whistleblowing by a public employee as a courageous act of loyalty to a larger community, and we allow whistleblowing public employees to be made whole through lawsuits against the State. *See* Tex. Gov't Code Ann. §§ 554.002-.003 (West 2004). Richard Howard, a unit manager with 24 years of service at the Texas Department of Assistive and Rehabilitative Services, reported several of his employer's practices that he believed violated the law to the State Auditor's Office ("SAO"). Howard alleges in his petition that when he requested clarification of Department practices from his own human resources director, as per the instructions of the SAO representative, his superiors learned of his report to the

SAO and retaliated. Howard was counseled and rated below standard on his yearly performance appraisal, effectively denying him promotions and merit pay increases. Howard sued the department under the Whistleblower Act, and a jury awarded him damages, costs and attorney's fees. In six issues, the Department challenges whether the evidence is legally and factually sufficient to sustain the jury's verdict. Because we find that the evidence is legally and factually sufficient, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Howard, who possesses a Ph.D. in anthropology from the University of Texas, is a unit manager in the disability determination services division of the Department. From the time Howard was employed by the predecessor of the Department in 1977 to the time of this dispute in 2001, he had established an exemplary work record, rising to his current position from the position of entry-level disability examiner. The testimony at trial indicates that, despite supervising a changing staff of 16 disability examiners, his unit consistently ranked among the Department's best in annual performance appraisals.

The record contains the caseload performance statistics that were used by the Department to evaluate individual units for cost-effectiveness and the timely processing of cases for the years 1997 to 2001. Based on the Department's performance standards, the rankings of Howard's unit were strong. Howard's unit ranked second, first, first, first and first, respectively, among the five units in his directorate, and sixth, second, third, fourth and third, respectively, among the 25 units in his division. Howard's unit performed capably despite accepting "underperforming" examiners from other units, which he then retrained and developed into better performing

2

employees. During fiscal year 1999, Director Connie Miller, Howard's supervisor, assigned Howard an examiner that had not met all of his job standards for the previous ten years. On Howard's performance appraisal dated September 1999, Miller noted, "[this disability examiner] meets or exceeds all of his job performance standards for FY-99. The above exemplifies Mr. Howard's ability to manage people."

He received similar accolades from his subordinates. He was nominated by unit employees for employee of the year for a sixth time in 1997. The record also includes a letter from three examiners in his unit, sent to Miller, which praised Howard for being "supportive" and an "exemplary supervisor." It stated, "[Howard's] skills as a mentor and problem solver continue to inspire us to try and excel above and beyond the general expectations of the agency." An associate commissioner who received a copy of the letter wrote to Howard, "[n]otes such as these . . . are elusive these days. I value what you did to earn this support and respect." Howard testified that in his 24 years at the Department, including 11 as a unit manager, he had never been rated below standard on any performance evaluation. Until 2001.

In late 2000, Howard became concerned with what he considered to be the arbitrary actions and policy decisions by upper management that he believed were hurting worker morale. When two of his subordinates were refused promotions based on unwritten career ladder requirements, he considered it "the straw that broke the camel's back." Howard compiled a list of the practices that concerned him, placing each into one of two different categories of infractions: he called the first the non-uniform application of policy and the second the falsification of state documents. In November or December 2000, he called the SAO and reported the practices.

The SAO representative did not take immediate action on the call. Instead, he referred Howard to the Department's human resources director for a written clarification of Department policy. Howard then requested the information from the director of human resources, Josephine Sanchez, as per the instructions of the SAO representative. In the organizational structure of the Department, however, Sanchez reported directly to Deputy Commissioner David Ward. Sanchez testified that even though Ward had hired her to specifically address the Department's problems with inconsistent practice and policy, Ward was irate when she told him of Howard's report on approximately January 3, 2001. Ward, according to Sanchez, called Howard a "loose cannon," and a "whistleblower," and "stated that Richard was not going to be promotable." According to Sanchez, Ward demanded that she not give any more information to Howard, including the policy interpretations requested by the SAO, and that if she did, Ward would view it as a personal attack on him by Sanchez.

On January 3, 2001, Ward's direct subordinate, Associate Commissioner Kay Chee, instructed Howard's supervisor, Miller, to discipline Howard for transferring reconsideration files between disability examiners. Miller, who testified that Howard was "one of my best supervisors," hesitated. According to Miller, there was no written policy that prohibited Howard's actions, this type of transfer was routine in the Department, and Howard was the only manager that he was instructed to discipline.

Despite disciplining Howard in January, Miller recommended Howard for a merit increase on May 29, writing, "Howard has met and/or exceeded performance standards of all essential marginal job functions of his functional job description over the last twelve months." On

4

October 12, Howard's merit increase was denied by Commissioner Chee, who instead directed Miller to discipline Howard again, this time because one of Howard's disability examiners misplaced a file, which delayed its processing for a substantial period of time. Miller disagreed with this order, too, as unreasonable and unfair. Miller testified that if it had been left to his discretion, as it usually was, he would not have rated Howard "below standard" because Howard lacked actual control over the individual files.

Soon thereafter, Miller was instructed by Chee to rank Howard "below standard" on the areas of his 2001 performance appraisal plan that corresponded to the issues for which he had been disciplined. Miller testified that even one below-standard ranking on a performance appraisal could "destroy a person's career," and that he was upset "because he knew what it was going to do to an excellent employee." As Chee's requests to Miller to discipline Howard became more frequent, Miller asked Chee, "Well, what do y'all have against Richard?" Miller testified that Chee responded, "Well, just do your job." Howard's "below standard" rating on his December 3, 2001, performance appraisal made him ineligible for a merit increase for the next 12 months.

In early 2002, three of the five program operations director positions, the position immediately above Howard's, became vacant. Despite this unprecedented opportunity for promotion, Howard was not chosen for any of the positions. As Commissioner Ward testified, Howard's negative performance appraisal made it impossible for him to be among the leading candidates for the jobs. At the time, Commissioner Chee selected all directors of program operations, and Commissioner Ward reviewed all the selections.

5

Howard filed suit against the Department in January 2002. On July 31, 2002, both David Ward and Kay Chee retired after 28 and 29 years of service to the Department, respectively.

At the conclusion of the trial, the jury answered all the questions in the court's charge in favor of Howard. The jury found that Howard made a good faith report to the SAO concerning the Department and that he had a good faith belief that the SAO was an appropriate law enforcement authority. The jury further found that the report was the cause of Howard's adverse performance appraisal and the denial of his 2001 merit increase and that if Howard had not made the report, neither of these actions would have occurred. The jury also found that the Department would not have written his adverse performance appraisal or denied Howard's merit increase based solely on information or observations not related to his report to the SAO.

The jury awarded Howard $259,799.31 in damages for the loss of one promotion and two merit pay increases, their effects on his retirement annuity and social security benefits through his life expectancy, and reasonable attorney's fees. This appeal ensued.

## ANALYSIS

### *The Controversy*

In its first, second, and third issues, the Department contends that the evidence is legally and factually insufficient to establish that Howard made a good faith report of a violation of law to an appropriate law enforcement authority. The Department further contends that the evidence is legally and factually insufficient to establish a causal link between Howard's report and his termination. The Department also asserts that the evidence shows that the same employment actions

6

would have been taken even if Howard had not made a protected report. Finally, the Department argues that the evidence is legally and factually insufficient to support the jury's award of damages.

Howard responds that he presented legally and factually sufficient evidence to prove the contested elements of his whistleblower claim and to support his damage award. Howard further responds that the jury's rejection of the Department's affirmative defense was not against the great weight of the evidence.

### Standard of Review

We are asked to determine whether Howard presented legally or factually sufficient evidence to prove the contested elements of his whistleblower claim and to support his damage award. Evidence presented at trial is legally sufficient if it enables reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Legal-sufficiency review must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* A reviewing court cannot substitute its judgment for that of the fact finder, so long as the evidence falls within the zone of reasonable disagreement. *Id.* at 822. When conducting a factual sufficiency review, we examine the entire record and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under either standard, jurors are the sole judges of credibility of the witnesses and the weight to give their testimony. *See City of Keller*, 168 S.W.3d at 819. Likewise, it is the province of the jury to resolve conflicts in the evidence. *Id.* at 820. Reviewing courts cannot impose their own opinions to the contrary. *Id.* at 819.

7

*Report of a Violation of Law*

The Whistleblower Act prohibits a state or local government entity from taking adverse personnel action against a public employee who in good faith reports a violation of law by the employing governmental entity to an appropriate law enforcement authority. Tex. Gov't Code Ann. § 554.002. The Act is designed to enhance openness in government and compel the State's compliance with law by protecting those who inform authorities of wrongdoing. *City of New Braunfels v. Allen*, 132 S.W.3d 157, 161 (Tex. App.—Austin 2004, no pet.). The Act evidences two legislative purposes: (1) to protect public employees from retaliation by their employer when, in good faith, employees report a violation of the law, and (2) to secure lawful conduct on the part of those who direct and conduct the affairs of public bodies. *Id.* Because the Act is remedial in nature, it should be liberally construed to effect its purpose. *Id.* (citing *Hill v. Burnet County Sheriff's Dep't*, 96 S.W.3d 436, 440 (Tex. App.—Austin 2002, pet. denied)).

Both parties agree that a "report," for the purposes of the Act, includes "any disclosure of information regarding a public servant's employer tending to directly or circumstantially prove the substances of a violation of criminal or civil law, . . . statutes, administrative rules or regulations." *Davis v. Ector County*, 40 F.3d 777, 785 (5th Cir. 1994) (citing *Casteneda v. Department of Agric.*, 831 S.W.2d 501, 503-04 (Tex. App.—Corpus Christi 1992, writ denied)). In the instant case, a reasonable jury could have found that Howard made a report to the SAO.

Howard testified that in late November or December 2000 he had a 45-minute telephone conversation with a representative of the SAO, who referred Howard to the Department's

8

human resources director for a written clarification of Department policy. Howard testified that he then requested the information from the director of human resources, Josephine Sanchez, testimony that Sanchez confirmed in her deposition presented at trial. An organizational tree depicting the structure of the Department and showing that Director Sanchez reported directly to Commissioner David Ward was admitted into evidence, as was an e-mail dated January 4, 2001, from Director Sanchez to Commissioner Ward, outlining "Richard's allegations." In the e-mail, Director Sanchez wrote, "Mr. Ward, I asked Richard if he had called the Texas Audit Committee as he'd indicated on our recent telephone conversation. He said that he did. . . ."

Howard testified at length about the contents of this telephone conversation. He recalled that he identified himself by name and as a manager at the Department and communicated to the SAO representative his "concerns about the illegality of these various what I thought were violations. And basically I was calling to inquire—to confirm actually whether what I thought were illegal acts were in fact illegal acts and thinking that would be the appropriate agency to whom I should report these violations." According to Howard, the SAO representative "listened to all— everything I had to say, the identification of all the infractions that I identified."

Howard testified that he discussed with the SAO representative every Department practice that he later included in a letter to the attorney general. The letter contained six complaints: (1) internal leave policies "do not conform to state employment law"; (2) the deputy commissioner selectively promoted individuals without posting the job positions and subjecting the applicants to competitive interviews; (3) Howard was directed to amend two final selection documents after they had been reviewed and approved by the director of human resources and legal services, so that the

9

final documents that were made available to the public were not the same as the approved copies; (4) management selectively allowed employees to retire and then be rehired; (5) employees were refused promotions based on unwritten career ladder requirements; and (6) unwritten requirements led employees to falsify their overtime reports.

Quoting Howard, the Department maintains that the call was merely an "inquiry" and that, because Howard was only seeking "opinions" regarding the "legality/validity" of the Department's practices, the call does not qualify as a report for the purposes of the Act. Howard had also used those words of circumspection in the letter listing his complaints and in an internal grievance that he subsequently filed with the Department. Howard, however, explained at trial that although he "thought [the practices] were illegal," he used those words because he was "not a lawyer and I certainly can't quote the statute definition of the illegal practices."

Neither the Act itself nor the definition of "report" provided in *Casteneda,* however, require the use of specific phrasing in a whistleblower report, nor do they require that a whistleblowing employee state his complaint in the affirmative, as opposed to reporting the matters in the form of a query. *See Casteneda,* 831 S.W.2d at 503-04. Rather, the Act only requires a disclosure of information by a public employee tending to directly or circumstantially show a violation by a public employer. *See id.* Based on the proof at trial, a reasonable jury could have found that Howard met that burden. Thus, Howard's report of the Department's alleged violations of law to the SAO was sufficient to establish this element of his whistleblower claim. *See* Tex. Gov. Code Ann. § 554.002(a).

We overrule the Department's first issue.

10

***Good Faith Violation of Law***

The supreme court has defined good faith in the whistleblower context to mean that (1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience. *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex. 1996). The first prong of this test considers the employee's subjective belief: whether the employee honestly believed the conduct reported was a violation of law. *Id.* at 784-85. The second prong is objective because it measures the employee's belief against that of a reasonably prudent employee in similar circumstances. *Id.* at 785. A report of an alleged violation of law may be in good faith even though incorrect, however, as long as a reasonable person with the employee's same level of training and experience would also have believed that a violation had occurred. *Id.* at 785-86.

Howard testified repeatedly that, at the time he called the SAO, he believed that certain policies and practices at the Department violated the law. In addition to the more general testimony described in the previous section, Howard also provided the representative of the SAO with specific names of laws that he believed were violated by the Department. Our sister court in San Antonio has found this persuasive, if not necessary, stating, "[t]he fact that [the whistleblower] has pointed out an *actual* law that he believes [his co-worker] violated is relevant to our inquiry here." *Bexar County v. Lopez*, 94 S.W.3d 711, 713 (Tex. App.—San Antonio 2002, no pet.). Howard testified that he believed that the policy incentivizing employees to falsify their overtime reports and the Department to keep a "double ledger system" for recording employee overtime violated the Fair Labor Standards Act. *See* Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-19

11

(1998). He also testified that he believed that his modification of a final selection document before it was made available to the public was a violation of the Open Records Act because it gave non-selected applicants a false understanding of their placement on the selection matrix. *See* Tex. Gov't Code Ann. §§ 552.021-.022 (West 2004).

Additionally, Howard testified that he discussed the Department's leave policy with the SAO representative and the specific laws and constitutional provisions that he believed it violated. The record shows that Howard understood this policy because it was the focus of complaints to him by one of his disability examiners, Janet Shannon, who had previously worked at the SAO. On October 27, 2000, shortly before he called the SAO, Howard forwarded to Miller an interoffice memorandum written to him by Shannon that expressed her concerns about the Department's leave policy. Howard included a short preface to the memorandum, in which he wrote, "Ms. Shannon points out that [Department] policy involving the '40 hour minimum leave balance' is in effect incompatible with the legal opinions, referenced by the Office of the State Auditor." Shannon's memorandum cited provisions in the Department's leave policy that appeared to violate "Article V, Section 8(c) of the General Appropriations Act-Texas Senate Bill 222[,] Texas Constitution, Article 1, Section 16 [and] the 14th Amendment of the Constitution of the United States." On appeal, the Department conceded that Howard reported a good faith violation of law with regard to agency leave policy.

Furthermore, a reasonable jury could also have found that Howard's beliefs and expectations were commensurate with his training and experience. Howard's testimony shows an understanding of the Department's written requirements and the specific instances where the

12

Department improperly and unfairly implemented its own policies. A jury could have concluded that a reasonably prudent manager with Howard's training and experience would have come to a similar conclusion. Thus, Howard's good faith report of the alleged violations of law by the Department was sufficient to establish the good faith element of his whistleblower claim. *See id.* § 554.002(a). The jury could reasonably have concluded that Howard, in good faith, reported a violation of law by the Department.

We overrule the Department's second issue.

***Appropriate Law Enforcement Authority***

The Department also contends that the evidence is factually and legally insufficient to support a finding that Howard made his report to an "appropriate law enforcement authority." "Appropriate law enforcement authority" is defined in the Act as an authority that is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to: (1) regulate under or enforce the law alleged in the report to have been violated; or (2) investigate or prosecute a violation of criminal law. *Id.* § 554.002(b). The determination of whether an entity is an appropriate law enforcement authority is a question of law. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).

Generally under *Needham*, we would first determine whether the SAO has been given the authority to either "regulate under or enforce the law" alleged in the report to have been violated, or "investigate or prosecute a violation of criminal law." *Id.* at 320. If the answer to any of these questions is yes, then the SAO is an appropriate law enforcement authority as a matter of law. Because neither party briefed the question of whether the SAO is an appropriate law enforcement

13

authority as a matter of law, we decline to address this question. Instead, we turn to an alternative formulation also addressed in *Needham*.

In light of subsection (b) of the statute, which was added in its entirety by the legislature in 1995, the *Needham* court determined that, even if an entity was not an appropriate law enforcement authority as a matter of law, a plaintiff could still prevail if he could demonstrate that he had a good faith belief that his report was made to an appropriate law enforcement authority. *Id*. The *Needham* court then applied the same test of good faith to section 554.002(b) that it utilized in determining whether a good faith violation of law had been reported under section 554.002(a). *Id*. at 320-21. The test for good faith belief regarding an appropriate law enforcement authority consists of a subjective and objective prong, both of which must be satisfied in order to satisfy the good faith standard. *Id*. at 321. The subjective prong requires that the employee believe that the governmental entity was either authorized to "regulate under or enforce the law alleged to be violated in the report" or that it was authorized to "investigate or prosecute a violation of the criminal law." *Id*. The objective prong requires that the employee's belief that the report was made to an appropriate law enforcement authority be reasonable in light of his training and experience. *Id*.

There is ample evidence that Howard subjectively believed that the SAO was the appropriate law enforcement authority to which he should report his complaints. As discussed earlier, Howard testified that the issue of the disparate treatment of employees with low annual and sick leave balances was originally brought to his attention by one of his subordinates, Janet Shannon, who had previously worked at the SAO. Howard forwarded to Miller the memorandum he received from Shannon, including the three separate "SAO Leave Interpretation Letters" that were attached

14

to it. Shannon's memorandum stated, "As we are all aware: The State Auditor is directed to provide uniform interpretation of the subchapters of the Texas Government Code relating to leave provisions and shall report to the governor and the legislature any state agency that practices exceptions to those laws." Howard testified that he was impressed with Shannon's memorandum and familiar with her credentials, having reviewed her file when she was transferred to his unit. In his testimony, Howard recalled that Shannon was "part of a task force with the Texas State Auditor's Office for a year and half performing investigations." As the Department conceded, "the only facts in the record that could arguably support a belief that the State Auditor's Office had regulatory or enforcement authority related to one of [Howard's] concerns is limited to the topic of the [the Department's] leave policy."

When Howard's subordinates were refused promotions based on unwritten career ladder requirements, he considered it, "the straw that broke the camel's back." Howard compiled a list of the practices that concerned him, placing each into one of two different categories of infractions: he called the first the non-uniform application of policy and the second the falsification of state documents. Howard did not know where to report the infractions, so he asked Janet Shannon for advice. Howard testified,

> I knew that she had been a Texas state auditor. I knew that she had been somehow responsible or involved in investigating these kinds of issues, so I went to her for some direction and said, Where do you think I should go, where should I take this? . . . . She recommended that I make my report to the Texas state auditor. . . . I'm vaguely remembering that she advised me that they were . . . involved with the regulation of—the application of policies and mismanagement among various state agencies in Texas.

15

From his conversations with Shannon, Howard derived his understanding of the powers of the SAO. He testified:

> [Shannon] explained to me that the Texas state auditor had subpoenaed her. I didn't realize until yesterday that they don't actually issue the subpoena but they request the subpoena. She talked about joint investigative committees involving the Department of Public Safety. She talked about the fact that based on the findings, entire boards had been removed, management audits had resulted in changing policies. So it seemed to me that was the place to go with my concerns.

Howard was asked, "At the time you made the phone call, what did you believe that the Auditor's Office had the power to do as a result of these?" Howard responded, "Bottom line, fix it."

Both parties adduced proof as to whether Howard's belief was reasonable in light of his training and experience. Susan Riley, a 27-year veteran of the SAO and an audit manager, testified that she was unaware of any studies or surveys conducted to determine what state employees know about the SAO. She believed that none had ever been conducted. Anthony Garrant, the acting state classification officer, was asked more directly if it would be unreasonable for a state employee to think that the SAO had regulatory authority, and he responded, "the word 'unreasonable' is a pretty strong word." Garrant continued, "people interpret things differently," according to their own training and experience. Commissioner Chee, a 28-year veteran of the Department at the time this dispute arose, was asked about the SAO at trial. Chee recalled that at her deposition she testified that the SAO may have been responsible for the oversight of departmental management audits. She also testified at her deposition that she believed the SAO was responsible for the "Sunset" audit and that if the agency failed that audit the SAO could shut down the Department.

16

But neither party addressed the statutory role of the SAO. Section 554.010, entitled "Audit of State Government Entity After Suit," states that, at the conclusion of a successful whistleblower lawsuit against a state governmental entity for a sum greater than or equal to $10,000, the attorney general shall provide to the SAO a brief memorandum describing the facts and disposition of the suit. Tex. Gov't Code Ann. § 554.010(a) (West 2004). Section 554.010(b) states:

> Not later than the 90th day after the date on which the state auditor's office receives the memorandum required by Subsection (a), the auditor may audit or investigate the state governmental entity to determine any changes necessary to correct the problems that gave rise to the whistleblower suit and shall recommend such changes to the Legislative Audit Committee, the Legislative Budget Board, and the governing board or chief executive officer of the entity involved. In conducting the audit or investigation, the auditor shall have access to all records pertaining to the suit.

*Id.* § 554.010(b).

The legislature itself has turned to the SAO to "audit or investigate" the state governmental entity that has been successfully sued, and its mandate acts as further evidence of the reasonableness of Howard's decision. *Id.* The jury could reasonably have concluded that Howard's report of the Department's alleged violations of law to the SAO was sufficient to establish this element of his whistleblower claim. *See id.* § 554.002(a).

We overrule the Department's third issue.

### *Causation*

The Department asserts that the evidence is legally and factually insufficient to establish that Howard's damages were caused by his good faith report to the SAO. Specifically, the Department contends that it took action against Howard because he improperly authorized a transfer

17

of reconsideration files to low-level disability examiners and because he was responsible for a misplaced file in his unit.

To prove causation in a whistleblower case, an employee need not prove that his reporting of the illegal conduct was the sole reason for the employer's adverse action. *Texas Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 634 (Tex. 1995). Rather, a public employee must demonstrate that, after he reported a violation of law in good faith to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his employer that would not have occurred had the report not been made. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000).

Circumstantial evidence may be used to establish a causal link between an employee's legally protected activity and an employer's retaliation. *See Continental Coffee Prods. v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996). Known as the *Cazarez* factors, such circumstantial evidence includes: (1) knowledge of the protected activity by the decision-maker, (2) expression of a negative attitude toward the plaintiff's protected activity, (3) failure to adhere to agency policy, (4) discriminatory treatment of plaintiff compared to similarly-situated employees, and (5) evidence that the stated reasons for the adverse action was false. *Id.* But evidence that an adverse employment action was preceded by a superior's negative attitude towards an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. *Zimlich*, 29 S.W.3d at 69.

There is ample evidence in the record that the two people directly involved in the decisions to take adverse employment actions against Howard—Commissioners Chee and Ward—knew of Howard's report to the SAO. The director of human resources, Josephine Sanchez,

18

testified that Howard talked to her about his SAO report in December 2000. Sanchez testified that even before she had the opportunity to inform Ward, Ward already knew that she had spoken with Howard. Sanchez testified that Ward called Howard a "whistleblower" and a "loose cannon," described Howard as "not promotable," and threatened to "fix him." Because Ward instructed Sanchez to ask Howard if he actually called the SAO, she wrote Ward an e-mail in January 2001 stating, "Mr. Ward, I asked Richard if he had called the Texas Audit Committee as he'd indicated on our recent telephone conversation. He said that he did. . . ." Ward denied Sanchez's statements, and testified that Sanchez had never told him that Howard had called the SAO.

Sanchez also testified that she spoke with Chee about Ward's threats directed towards Sanchez, and that she informed Chee about the ongoing dialogue she was having with Howard. Sanchez testified that she and Chee "had extensive telephone conversations where she told me about David Ward," and that Chee advised Sanchez to "be very careful" because Ward "was definitely after" her. Sanchez was then asked, "[d]id [Chee] tell you why Ward was after you?" to which Sanchez responded, "Yes. Because [Chee] said that [Ward] viewed me as being a whistleblower and that I was assisting Richard."

Howard introduced evidence showing that the Department counseled and disciplined him in a manner that deviated from its standard practices and the way it treated other similarly-situated employees. Miller testified that Chee instructed him to subject Howard to disciplinary counseling for his transferring of reconsideration files to disability examiners even though the practice was routine in the agency. Miller testified that Howard was the only unit manager ever disciplined for this practice. There was also evidence that Chee and Ward had tolerated much more

19

serious file transfer abuses. For example, Miller testified that, in the recent past, when the Social Security Administration had put a hold on continuing disability review cases, one director and one unit manager ignored the directive and transferred their "hold" files back to Social Security, thus shortening their unit's processing time and artificially inflating its productivity numbers. Miller testified that it was common knowledge in the Department that these two employees had violated policy, and it was openly discussed at a meeting over which Chee presided and Miller attended. Miller testified that Chee expressed no negative opinion about the transfers at the meeting and that both employees were promoted shortly thereafter. In Miller's opinion, these file transfers were far more serious than Howard's transfer of reconsideration files.

Howard also adduced evidence that his being disciplined for the lost file was a pretext for the department's adverse employment action. Miller testified that when evaluating unit managers, he generally had discretion to simply not rate an item on a quarterly performance review, instead of rating the item "below standard." Miller testified that he had exercised that discretion on reviews for other unit managers and that if Howard's review had been left to his discretion, he would have chosen not to rate Howard on the standard corresponding to the lost file. Miller testified that Howard was an excellent supervisor and that he objected to the rating because Howard was "going to be rated below standard on a new standard which I thought was unreasonable to be in his job description anyway because I didn't think that—I thought the standard was unreasonable for supervisors." When Miller was asked, "who is the person that directed you specifically to include in this quarterly counseling that Mr. Howard was going to be rated below standard on his [performance appraisal plan]?" he identified his supervisor, Kay Chee. Miller thought the action so

20

inappropriate that he wrote in the subjective comments section of the quarterly counseling, "I find this very ironic as his unit was never above two percent in aged cases. Every [disability examiner] in the unit exceeded the 120 aged case standard."

When Miller and Chee discussed Howard's yearly performance appraisal plan in the fall of 2001, Miller again voiced his concerns about rating Howard "below standard" on the items corresponding to his transfer of cases and the lost file. Miller again expressed his preference to not rate the two standards because he knew that even a single "below standard" rating could "destroy a person's career to some degree in the agency, especially if you're a supervisor." Miller added, "in this case, with his past job performance, I had problems with that because I knew what it was going to do to an excellent employee." According to Miller, Chee again asserted an unusual amount of interest in controlling Howard's evaluation. Miller recalled that a similarly-situated unit manager who was rated "below standard" on one of the same items as Howard was later allowed by Chee to change the rating to "not rated." In sum, Miller testified that Chee's treatment of Howard was both unfair and disparate.

Howard also presented evidence that Chee and the Department overreacted to the lost file and seized it as an opportunity to reprimand Howard. The discovery of the file in Howard's unit was triggered in part by a letter from a federal disability program administrator to Commissioner Ward inquiring about the status of certain files that had been active for more than a year. However, the letter did not criticize the Department's performance. Instead, it said, "the list is remarkably short considering the size of your pending workload." Additionally, as mentioned above, Miller

21

testified that it is unfair to discipline unit managers for lost files because disability examiners are primarily responsible for individual files.

We hold that the evidence is legally and factually sufficient to establish that the Department would not have taken negative action against Howard when it did if Howard had not reported Department practices to the SAO. Although there is conflicting evidence as to why Howard was disciplined, the jury was free to believe some witnesses, disbelieve others, and resolve any inconsistencies in their testimony. *See City of Keller*, 168 S.W.3d at 822. The jury's finding on causation is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176.

We overrule the Department's fourth issue.

### *Affirmative Defense*

In its fifth issue, the Department complains that the jury rejected, against the great weight of the evidence, the affirmative defense submitted in questions one and two. It is an affirmative defense to a whistleblower action that the Department would have taken the negative personnel actions against Howard based solely on information that is not related to the fact that he made his protected report to the SAO. *See* Tex. Gov't Code Ann. § 554.004(b) (West 2004).

Here, the Department has the burden of proof on its affirmative defense. When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). Whether the great weight challenge is to

22

a finding or a nonfinding, a court of appeals may reverse and remand a case for a new trial only when it concludes that the finding or nonfinding is against the great weight and preponderance of the evidence. *Ames v. Ames*, 776 S.W.2d 154, 158-59 (Tex. 1989); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988).

In reviewing this issue, we are reminded of the supreme court's admonition that we may not reverse simply because we conclude that "the evidence preponderates toward an affirmative answer." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988). We may only reverse where "the great weight of [the] evidence supports an affirmative answer." *Id.*

After a lengthy charge conference that produced an agreed jury charge, the Department now complains that the jury was distracted by confusing charge questions. This appears to be an attempt by the Department to argue charge error without asserting it as an issue on appeal, because the Department failed to preserve this error at the trial court. We have already discussed the evidence that supports the jury's rejection of the Department's affirmative defense. Based on the evidence, the jury could reasonably have rejected the Department's affirmative defense submitted in questions one and two.

We overrule the Department's fifth issue.

### *Damages*

In its sixth issue, the Department asserts that the evidence is legally and factually insufficient to support the jury's award of damages. We have previously refused to uphold an award of damages for a discretionary bonus in a whistleblower case, and the Department contends that we should reverse the award of damages here because there is no evidence other than speculation

23

showing that Howard suffered any economic harm from the negative performance evaluation. *See Housing Auth. of Crystal City v. Lopez*, 955 S.W.2d 152, 156 (Tex. App.—Austin 1997, no pet.). The Department also contends that Howard's report could not have been the reason his merit increases were denied because the sole decision maker, Commissioner Chee, was unaware of the report at the time she denied the raise—a contention we have already rejected.

Harvey Corn, C.P.A., testified as an expert on Howard's economic harm. Although Corn was timely designated and his report timely produced, the Department never took his deposition, never sought additional information about his expert opinions, never designated its own economic damages expert, and never filed a *Daubert/Robinson* challenge to Corn's testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995). The Department also did not object to any part of Corn's report. Nor did the Department object to any of Corn's testimony until after his report had already been admitted into evidence in its entirety.

Corn testified that "the mathematics, the source data, the information that supports work life expectancy and life expectancy, the automated calculators provided by the State of Texas and the Social Security Administration are all I think as good as you can get." He testified that his report and testimony were based on reasonable accounting probability. In his report and in his testimony at trial, Corn detailed the process he followed to determine Howard's economic damages.

Corn began his report with Howard's claims that: (1) he was wrongly denied two merit pay increases of four percent base pay that should have commenced on September 1, 2001, and September 1, 2002; (2) alternatively, he was wrongly denied a promotion on February 1, 2002, from his current pay grade of B-12 to pay grade B-13, and, in accordance with Departmental practice, an

24

increase to pay grade B-14 one year later, on February 1, 2003; and (3) he may have been denied the benefits of both the promotions described above and of the effect of the five percent merit pay increase he received on March 1, 2004, when applied to the higher salary level of grade B-14. Corn then calculated a dollar figure for each of these alternative damage scenarios. Corn's damage calculations consisted of the following: (1) the difference between Howard's actual wages and his expected wages through the expected date of trial; (2) the difference between Howard's actual wages and his expected wages through the completion of his work expectancy; (3) the difference in Howard's retirement annuity based on his current compensation and his expected compensation through his life expectancy; and (4) the difference in Howard's social security benefits through his life expectancy. His report concluded with the calculation of exact dollar figures for each of the three alternative damage scenarios:

> it is my opinion that Richard Howard was damaged by the [Department's] failure to grant merit pay increases on September 1, 2001, and September 1, 2002, in the amount of $129,673 and in the alternative Mr. Howard was damaged as a result of the [Department's] failure to grant him promotion on February 1, 2002, in the amount of $119,774. Additionally, Mr. Howard may have been damaged in amount of $180,691 as a result of both the failure to grant promotion and the failure to apply his March 1, 2004, merit pay increase to the appropriate wage rate.

The jury, however, was not limited to these three choices. At trial, Corn testified that he constructed his report so that his figures could be adjusted by the jury if they disagreed with the size of the merit pay increases used in his calculations, or if they believed that the merit pay increases or promotions would have occurred on dates not contemplated by the report. This flexibility proved unnecessary, however, as the jury awarded $180,691 to Howard, the exact dollar amount that Corn specified in his report and testimony corresponding to the third damage scenario.

25

The jury weighed the conflicting evidence, decided the facts, and calculated a damage award that exactly matched Corn's damage calculations. But Corn's report was not the only evidence on Howard's damages. Howard supported Corn's report by producing evidence, discussed in greater detail above, to show that Howard was denied merit increases and promotions because of his call to the SAO. In summary, Miller testified that he recommended Howard for the May 2001 merit increase and that Chee denied it, and both Miller and Howard testified that the negative 2001 performance appraisal made Howard automatically ineligible for a merit increase in May of 2002. Regarding Howard's loss of promotions, Miller testified that the "below standard" rating that Howard received on his 2001 performance appraisal could "destroy a person's career." Howard then testified that three of the five director of program operations positions, the position directly above his, became vacant simultaneously only two months after he had received the negative marks on his performance appraisal. He testified that he applied, interviewed, and was subsequently denied for all three director positions and that Commissioners Chee and Ward were responsible for choosing the new directors.

For the above reasons, the jury's award of damages for Howard's lost promotions and merit pay increases in the instant case is distinguishable from the "annual salary adjustment" that we declined to uphold in *Crystal City*. *See Crystal City*, 955 S.W.2d at 156. In *Crystal City*, the "annual salary adjustment" was an annual bonus given at the discretion of the agency. *Id.* In the instant case, Howard's damages reflect salary increases and promotions based solely on merit. Thus, we hold that the evidence is legally and factually sufficient to support the jury's award of damages.

We overrule the Department's sixth issue.

26

*Conclusion*

Having overruled the Department's issues, we hold that the evidence was legally and factually sufficient to support the jury's verdict. We affirm the trial court's judgment.

_____

Jan P. Patterson, Justice

Before Justices B. A. Smith, Patterson and Waldrop

Affirmed

Filed: December 8, 2005