# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00244-CV

**Texas Department of Criminal Justice, Appellant**

**v.**

**Edward McElyea, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GN-01-003776, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

The Texas Department of Criminal Justice appeals a judgment entered pursuant to a jury verdict finding the Department liable to Edward McElyea for violations of the Texas whistleblower statute and awarding McElyea actual damages and attorney's fees. *See* Tex. Gov't Code Ann. § 554.002 (West 2004). In its sole issue on appeal,[1] the Department contends that legally and factually insufficient evidence was presented at trial to support findings that McElyea reported a violation of law in good faith and that his report was causally linked to the decision not to rehire him after a reduction in force eliminated his position at the Department. We will affirm the trial court's judgment.

---

[1] The Department raised a second issue related to the jury charge in its initial brief, but withdrew that issue in its reply brief.

**BACKGROUND**

McElyea began working for the Department in 1984 as an investigator in the Internal Affairs Division.[2] The Internal Affairs Division investigated the conduct of Department employees, including complaints of excessive use of force by prison employees against inmates. During his tenure with the Internal Affairs Division, McElyea received a number of promotions: in 1985, he was promoted to assistant regional manager; in 1989, he was promoted to regional manager; and in 1994, he was promoted to multi-regional administrator, the position that he retained until its elimination in May 2001. McElyea was never disciplined as an employee of the Department. All the witnesses who expressed an opinion testified that McElyea was a good employee.

Around February 27, 2001, McElyea had a conversation with Fred Rhea, a peace officer for the Department, in which Rhea told McElyea that Terry Cobbs, another Department peace officer, "had called up Fred and given him an assignment to work" a job providing security for a wealthy Houston family that was visiting the central Texas area. Cobbs had been working for the family for some time, but was unavailable for that particular assignment. Rhea told McElyea that he had been paid $500 for the job. McElyea did not inquire further about the security job, and the conversation moved to another subject.

The following day, McElyea decided that he needed to report Cobbs's conduct to his superiors because the Department's code of ethics required employees to "report any corrupt or unethical behavior which could affect employees, offenders, or the integrity of the TDCJ." McElyea

---

[2] Before starting with the Department, McElyea worked as a police officer for the City of Waco and served as the chief of police for the City of Rosebud.

testified that he believed that Cobbs had violated Department policies concerning approval of off-duty jobs and use of the Department commission in connection with off-duty jobs[3] and also potentially violated the Private Security Act[4] and state law governing the use of state vehicles.[5] After a management conference, McElyea approached the three people in his chain of command that were above him in the organization—John McAuliffe, the Inspector General for the Department,[6] Leon Guinn, the director of the Internal Affairs Division, and Claude Williams, the deputy director of the Internal Affairs Division—to discuss his conversation with Rhea and McElyea's concerns about Cobbs's conduct violating state law and Department policies.

According to Guinn, "McAuliffe seemed to be very agitated and upset at the allegation." Guinn stated that he had three conversations with McAuliffe about McElyea's allegations and that each time McAuliffe seemed upset.[7]

---

[3] Testimony indicated that obtaining legislative approval for commissioning Internal Affairs employees as peace officers was a long and hard-fought process and that management was concerned about any activities that might jeopardize the ability to commission employees.

[4] *See* Tex. Occ. Code Ann. §§ 1702.001–.413 (West 2004 & Supp. 2006). The Private Security Act regulates the provision of security services by private individuals and entities.

[5] *See* Tex. Gov't Code Ann. § 2113.013 (West Supp. 2006) (providing that state employees may not use state vehicles for anything other than official state business unless they have been authorized by the head of a state agency "to commute to and from work").

[6] The Department's Office of the Inspector General oversaw the Internal Affairs Division.

[7] McAuliffe testified, "I did not want to get into a situation where there was going to be an allegation and counter-allegation, an allegation and counter-allegation that would get into a personal level among our staff when I was trying to make an effort at the end of my tenure to, quote, unquote, bring us together."

3

McAuliffe testified that shortly after McElyea's oral report, he asked John Moriarty, who supervised Cobbs and Rhea, to look into McElyea's allegations. Cobbs authored two interoffice communications on March 5, 2001. In the first, Cobbs described contacting Rhea regarding a job for a family that required assistance with child care. In the second, Cobbs asked permission to hold outside employment. In it, he stated that "[t]he employment includes 'house sitting' at a private residence and assisting with child care on an as-needed basis." At trial, Cobbs admitted that he was the head of security for the family and had coordinated the activities of a sizeable cadre of off-duty peace officers. Documents admitted into evidence at trial indicate that Cobbs had worked for the family as head of security for several years prior to March 2001 and often worked as much as 32 hours per week.

McAuliffe testified that during this inquiry, it came to his attention that fifteen to twenty Internal Affairs employees held unapproved off-duty jobs. McAuliffe stated that he instructed Moriarty to "find out who these people were, what their duties were and then to have them put the proper request through their supervisors for approval to see if it would be approved that they could work an extra job." McAuliffe testified that he, Moriarty, and Guinn decided that this was the appropriate course of action to respond to McElyea's allegations rather than to open a large investigation that would involve many Internal Affairs Division employees. McAuliffe testified that he had some questions about Cobbs's two interoffice communications—McAuliffe's handwritten notes on the documents indicate that he desired further information concerning whether the job involved security or childcare, how often Cobbs was working, and "whether or not [Cobbs was] required to be armed for childcare." McAuliffe testified that Cobbs provided satisfactory answers

4

to the questions, although he could not recall any details, and that he did not make any further inquiries about Cobbs.

On March 12, 2001, in response to a request from McAuliffe, McElyea faxed to McAuliffe an interoffice communication that stated,

> On or about February 27, 2001, Investigator Fred Rhea was in my office discussing various subjects of mutual interest. Investigator Rhea informed me that Investigator Terry Cobbs, who is assigned to the Gulf Coast Violent Offenders Fugitive Task Force, had contacted him regarding an off duty job. Investigator Rhea informed me that Cobbs was providing security to a wealthy individual who lived in Houston, Texas, and was being paid for it. Rhea further advised me that this unknown person had traveled to the San Antonio area and that Cobbs had requested that Rhea provide security for this person and Rhea did so. I informed you of this information on February 28, 2001, in the presence of Mr. Guinn. On March 12, 2001, you directed me to provide you with this information in writing, and this IOC fulfills that order.

The document went on to state that "[i]f these allegations are found to be true, Investigator Cobbs has violated IAD and TDCJ Policy. In addition Cobbs may have violated state laws governing peace officers that utilize their commission for off duty private security jobs." McElyea included an internet summary of the Private Security Act with his interoffice communication.

Williams, who was McElyea's direct supervisor at the time the allegations were made, testified that he spoke with both McAuliffe and Moriarty about McElyea's allegations shortly after they were made. Williams stated that McAuliffe told him that McElyea "needs to back off of that, that Mr. Moriarty was going to be the next Inspector General and you've got to let it go at that." Williams further testified, "Mr. Moriarty came to my office. He shut the door. And I could tell he was very angry. He was red in the face. And he said, 'You need to do something about McElyea.'" Williams said that Moriarty warned that McElyea "needs to keep his nose out of things not his

5

business and needs not to be writing IOCs [interoffice communications] on people that work for me." When Williams told Moriarty that he would talk to McElyea, Moriarty instructed, "Tell him he doesn't know who he's fucking with."

On April 2, 2001, an interoffice communication authored by McAuliffe and Guinn concerning the use of state vehicles was distributed to all employees of the Office of the Inspector General and the Internal Affairs Division. The document stated, among other things, that "[a]ll personnel are reminded that State-owned and leased vehicles shall not be used for any purpose other than official State business." Guinn testified that the document was prepared as a "direct follow-up" to McElyea's allegations about Cobbs's misuse of his state vehicle.

McElyea testified that he met with McAuliffe on April 26, 2001, and that he asked McAuliffe "what he was going to do about this allegation involving part-time jobs and state vehicles, and he told me he was not going to—that he was not going to do anything about it."[8] McElyea stated,

> That's when I told him that we were just in the middle of disciplining an employee for the very same thing and that, you know, I thought that it was a violation of law and a violation of policy, and I felt like he needed to do something. And that's when he said he didn't want to cause any problems for me.

McElyea testified that he also brought up the Private Security Act at the April meeting with McAuliffe:

---

[8] McElyea documented this conversation in a memo to the file that he authored shortly after the conversation occurred.

6

I told him that if Terry Cobbs was supervising and employing peace officers, he had to have a security officer's license and that we were going to—we were going to get in trouble over that. . . . It was one of those deals that once it was out there and people know about it and it needed to be investigated, and he—you know, he got angry with me.

Approximately one week later, McAuliffe retired from the Department, and on May 17, Moriarty was appointed to succeed McAuliffe as the Inspector General for the Department. On May 22, McElyea was informed that the Internal Affairs Division was being reorganized and that his position was being eliminated in connection with a reduction in force. The reorganization eliminated the deputy director position and reduced the number of multi-regional administrators from four to two. McElyea was told that all four multi-regional administrators would have to apply for the two remaining positions, that he could continue in his current position at his current salary for ninety days while he tried to secure other employment, and that he would receive a preference over outside applicants for jobs within the Department because his position was eliminated as a result of a reduction in force.

Three of the four multi-regional administrators, including McElyea, applied for the two remaining multi-regional administrator positions. Moriarty conducted the interviews and made the selections. McElyea found out on June 15, 2001, that the two positions had been awarded to the other two multi-regional administrators who applied. Around the same time, McElyea also applied for an open director of investigations position in the Office of the Inspector General. Moriarty awarded the position, which was one rank above the multi-regional administrator position that McElyea had held, to another applicant. McElyea testified that on June 15, 2001, Moriarty called him and told him "to pack [his] shit and get it out of the office by Monday." In late July 2001,

7

McElyea was offered and accepted a position in the Department's Parole Division. The job was not a law enforcement position, was not within the Internal Affairs Division or the Office of the Inspector General, and paid less than McElyea's multi-regional administrator position.

In February 2002, McElyea applied for an open regional manager position in the Internal Affairs Division. Although McElyea had worked as a regional manager for the Internal Affairs Division for around five years and had been promoted from that position, Moriarty awarded the position to another applicant without conducting interviews.

Moriarty testified that he would have done whatever it took to keep McElyea from getting a job in the Internal Affairs Division after the reorganization:

Q. If you had any say, he wasn't going to get it?

A. Right. Well, as far as if I had a choice between him and someone else that was qualified and the other person was loyal to me and wasn't bad-mouthing me, I mean, I'd have to be a fool not to take that person.

. . . .

Q. And I'm glad you said that, because you've stated, haven't you, that even if Mr. Rhoten's [the other interviewee for the director of investigations position] background investigation had come back negative and you couldn't have hired him, you probably would have vacated that board so that you wouldn't have to hire Mr. McElyea?

A. That was an option, yes.

Q. And you probably would have done that?

A. I could possibly have, yes.

Q. You weren't going to let him get that director's position, were you?

A. I'd be a fool to.

8

. . . .

Q. Again, there was no way that you were going to put Mr. McElyea in a regional manager position, correct?

A. That's correct.

Q. Again, because you couldn't trust him?

A. I couldn't trust him, and he—and I knew he was after me.

Q. Even if Mr. Davis [the person eventually hired as regional manager] was disqualified because he had falsified his application, you wouldn't have put Mr. McElyea into the position, would you?

A. I probably would have vacated the board and got another board.

Q. Found a way not to hire Mr. McElyea?

A. That's correct.

After exhausting the Department's grievance process, McElyea filed suit against the Department on November 15, 2001, alleging that as a result of his good faith report of a violation of law, his position was eliminated, he was not rehired as a multi-regional administrator, and he was not hired as the director of investigations. McElyea filed an amended petition on July 22, 2002, adding an allegation that he was not hired as a regional manager because of his good faith report of a violation of law.

A jury trial began on December 6, 2005, and lasted for four days. The trial involved hotly disputed testimony on many factual issues and required the jury to make multiple credibility determinations in reaching its verdict. The jury returned a verdict finding that the Department failed to rehire McElyea as a multi-regional administrator and failed to hire him as a regional manager as

a result of McElyea's good faith report of a violation of law. McElyea elected to receive damages based on the jury's finding with respect to the multi-regional administrator position, and the trial court entered a judgment awarding McElyea $198,876.00 in damages and $124,187.50 in attorney's fees. This appeal followed.

## DISCUSSION

Great care must be taken when addressing the important matter of a public whistleblower suit. As this Court has noted,

> The State of Texas elevates public employees who report legal wrongdoing to a protected status as a matter of fundamental policy. The State views whistleblowing by a public employee as a courageous act of loyalty to a larger community, and we allow whistleblowing public employees to be made whole through lawsuits against the State.

*Texas Dep't of Assistive & Rehabilitative Servs. v. Howard*, 182 S.W.3d 393, 396 (Tex. App.—Austin 2005, pet. denied).

The Texas whistleblower statute is designed to enhance openness in government by protecting public employees from retaliation by their employers when they report violations of law in good faith and to secure lawful conduct on the part of those who direct and conduct the affairs of government. *City of San Antonio v. Heim*, 932 S.W.2d 287, 290 (Tex. App.—Austin 1996, writ denied) (op. on reh'g). Because the statute is remedial in nature, we construe its provisions liberally. *University of Houston v. Barth*, 178 S.W.3d 157, 162 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

10

The whistleblower statute provides that "[a] state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." Tex. Gov't Code Ann. § 554.002(a). Thus, McElyea was required to prove (1) that he was a public employee, (2) that he reported a violation of law in good faith, (3) that the violation of law reported was committed by his employing governmental entity or another public employee, (4) that the report was made to an appropriate law enforcement authority, and (5) that his employing governmental entity took an adverse personnel action against him because of the report.

While the Department concedes that McElyea and Cobbs were public employees at the time of McElyea's report and that McElyea made his report to an appropriate law enforcement authority, it contends that legally and factually insufficient evidence was presented at trial to support findings that McElyea reported a violation of law in good faith and that his report was causally connected to the adverse personnel action.

In a legal-sufficiency review, this Court must credit evidence favorable to the verdict if reasonable jurors could, disregard contrary evidence unless reasonable jurors could not, and reverse the jury's determination only if the evidence presented at trial would not enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing the factual sufficiency of the evidence, we look at all the evidence and set aside the jury verdict only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Under either

11

standard of review, we must be mindful that the jurors are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. *City of Keller*, 168 S.W.3d at 819. Jurors may choose to believe one witness and disbelieve another. *Id.* This Court must not impose its own opinion to the contrary. *Id.* Resolution of conflicts in the evidence is within the province of the jury. *Id.* at 820.

**Good-Faith Report of a Violation of Law**

The Texas Supreme Court has held that in the context of the whistleblower statute, good faith is analyzed using an objective standard and a subjective standard. *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex. 1996). "'Good faith' means that (1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience." *Id.*

The test's first element—the "honesty in fact" element—ensures that a public employee seeking a whistleblower-statute remedy believed that he was reporting an actual violation of law. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 320 (Tex. 2002) (citing *Hart*, 917 S.W.2d at 784–85). The test's second element ensures that even if the reporting employee honestly believed that the reported act was a violation of law, the reporting employee only receives protection if a reasonably prudent employee in similar circumstances would have believed that the facts as reported constituted a violation of law. *Id.* (citing *Hart*, 917 S.W.2d at 785).

There is no requirement that an employee identify a specific law when making a report. *Llanes v. Corpus Christi Indep. Sch. Dist.*, 64 S.W.3d 638, 642 (Tex. App.—Corpus Christi 2001, pet. denied). Nor does an employee need to establish an actual violation of law. *Id.* But there

12

must be some law prohibiting the complained-of conduct to give rise to a whistleblower claim. *Id.* In other words, when an employee believes and reports in good faith that a violation has occurred, but is wrong about the legal effect of the facts, he is nevertheless protected by the whistleblower statute. *Id.*; *Castaneda v. Texas Dep't of Agric.*, 831 S.W.2d 501, 504 (Tex. App.—Corpus Christi 1992, writ denied); *Lastor v. Hearne*, 810 S.W.2d 742, 744 (Tex. App.—Waco 1991, writ denied).

The Department contends that legally and factually insufficient evidence was presented at trial to support a finding that McElyea reported a violation of law in good faith. The Department urges that McElyea's belief that a law was violated is not objectively reasonable in light of his education and years of experience in law enforcement, that no existing law prohibits the conduct that McElyea reported, and that because McElyea did not ask follow-up questions about or investigate the facts surrounding Cobbs's off-duty employment and use of his state vehicle, McElyea did not have sufficient information to form an objectively reasonable belief that any law had been violated.

### *Misuse of State Vehicles*

To a large extent, the trial of this case boiled down to a credibility contest between the major players—a typical "he said, he said." At trial the Department took the position, through the testimony of Moriarty and McAuliffe, that McElyea never even mentioned the misuse of state vehicles. In contrast, McElyea testified that he did report the misuse of state vehicles, and Leon Guinn, the director of the Internal Affairs Division at the time of the report,[9] not only corroborated

---

[9] Guinn had substantial law-enforcement experience before coming to the Department: he worked for the United States Customs Service for 33 years, retiring as special agent in charge of the Houston field office.

13

McElyea's testimony about his February report concerning state vehicles, but testified that the memo that he authored with McAuliffe that was sent out to all Internal Affairs Division employees on April 2, 2001, concerning the use of state vehicles, was a direct consequence of McElyea's report. The memo warned, "All personnel are reminded that State-owned and leased vehicles shall not be used for any purpose other than official State business." The jury apparently found the testimony of McElyea and Guinn, along with the April memo, to be more credible on this issue.

On appeal, the Department now takes the position that McElyea's report was too equivocal—that it was phrased as a potential violation, not an actual violation—that McElyea needed to investigate further, and that if he had done so, he would have discovered that no violation had actually occurred.

### Adequacy of the Report

According to the Department, McElyea failed to make the necessary showing that he believed that a crime had been committed and has thus failed to satisfy the test's subjective "honesty in fact" element. Although the Department cites a selected excerpt from McElyea's cross-examination, which the Department contends demonstrates that McElyea wavered or equivocated about whether a law was broken, the Department ignores McElyea's testimony in which he pinpointed the law that he believed that Cobbs had violated and unequivocally asserted that he made the report:

> Q. Did you report that Terry Cobbs was violating state law by the use of his state vehicle to Mr. McAuliffe?
>
> A. Yes.

14

Q. When?

A. On February 28th and on March 12th.

Q. Did you also talk to him about it in April?

A. Yes.

Also, the Department completely ignores the testimony of Leon Guinn, the director of the Internal Affairs Division, who corroborated that McElyea reported his concern that Cobbs was misusing a state vehicle while working a private job.

Further, in a memo for the record dated April 26, 2001, McElyea stated,

On this date I asked Mr. McAuliffe if I could speak to him before he left for the day. He came into my office at approximately 5:45PM. I asked him if he had received and reviewed the information concerning Investigator Cobbs working a part time job, in violation of IAD and TDCJ policy. He stated he asked John Moriarty to check into it and John advised him that Cobbs was merely "House-sitting" for someone. He admitted that Cobbs did violate TDCJ policy by not reporting that he had a part time employment [sic], but that he was not going to take action on it. He stated that others were also working part time and had not reported it. I asked him if this was a reason to not take disciplinary action because others were doing it [sic]. He stated that he did not want to cause "any mudslinging" and he did not want to cause any problems for me. I asked him why would this cause problems for me as I believed that I had acted in good faith as required by my position in this agency. He did not elaborate as to how this may cause me problems, when in fact Cobbs was the one who violated the policy. I further advised him that Investigator Fred Rhea had told me he was paid over $500.00 for providing personal security while the person was in the central Texas area, therefore I did not believe that Cobbs was telling the truth when he said that his job was merely "House-sitting". I advised Mr. McAuliffe that Investigator Rhea told me that Cobbs was providing personal security for a wealthy family, therefore I believe that Cobbs was using his commission, as I believe that he was carrying his personal weapon while working this job. I also advised Mr. McAuliffe that I was concerned about Cobb's [sic] use of the state vehicle and state time to work this part time job. Mr. McAuliffe told me he was concerned about this but that he did not intend to conduct an investigation or take any disciplinary action regarding this matter.

15

This evidence would allow a reasonable jury to conclude that McElyea reported what he believed was an actual violation of law, not a potential violation. No overwhelming evidence to the contrary was presented.

**Failure to Investigate**

The Department next complains that because McElyea did not conduct an investigation into Cobbs's use of his state vehicle, McElyea did not have sufficient facts to make a good-faith allegation that Cobbs had misused his state vehicle based on the conversation with Rhea. In essence, the Department argues that McElyea's belief that a law was violated is not reasonable in light of his law enforcement training and experience. *See Harris County Precinct Four Constable Dep't v. Grabowski*, 922 S.W.2d 954, 956 (Tex. 1996) (per curiam) (holding that courts should examine the reasonableness of a peace officer's belief that a law has been violated more closely than the beliefs of others because a peace officer has more experience than those in other professions in deciding whether an act is a violation of law).

McElyea, however, had additional information at his disposal—McElyea testified that part of his administrative duties included reviewing irregularities in investigators' paperwork, such as time records and mileage logs. McElyea testified that because he had seen Cobbs's mileage logs, he knew how much mileage Cobbs was putting on his state vehicle and he was aware that Cobbs always drove his state vehicle everywhere. The Internal Affairs Division frequently investigated governmental employees for misuse of state vehicles. McElyea had been personally involved in

16

many such investigations and was aware of a pending investigation concerning another employee's misuse of a state vehicle at the time of his reports about Cobbs.

McElyea, as a peace officer, can be credited with a higher level of astuteness in detecting impropriety than the average citizen. In the context of determining whether peace officers had reasonable suspicion to support investigative detentions, the United States Supreme Court has stated that courts must look at the totality of the circumstances in order to acknowledge that peace officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). McElyea could be expected to make inferences and deductions from the information available to him that may not have caught the attention of an untrained eye, but that would allow McElyea, as a peace officer who investigated employees' misuse of state vehicles as part of his duties, to arrive at the conclusion that Cobbs was misusing his state vehicle. Considering the totality of the circumstances, it was not unreasonable for McElyea to believe that Cobbs was driving his state vehicle to his off-duty job.

This is not a case like *Texas Department of Criminal Justice v. Terrell*, 18 S.W.3d 272 (Tex. App.—Tyler 2000, pet. denied), where the report of illegal conduct was based "solely on rumor and innuendo." *Id.* at 276. "The only bases Terrell pointed to for his allegations [concerning misappropriation of state resources to pay expenses for a girlfriend] were 'word of mouth' and that 'every warden knew about the relationship.'" *Id.* Here, McElyea had specific information from Fred Rhea, a peace officer, that Cobbs had arranged for Rhea to work a private security job for a wealthy

17

Houston family for whom Cobbs regularly worked. The job did not involve providing "house-sitting" services at their Houston residence, but rather involved travel to central Texas to provide security to the family on their trip. Rhea informed McElyea that Cobbs would have performed the job himself but for a scheduling conflict. While a report may not be based on rumor and innuendo, it is permissible for a whistleblower's knowledge about violations of law to be based on hearsay. *Castaneda*, 831 S.W.2d at 504. Additionally, McElyea had reviewed Cobbs's mileage logs and knew that Cobbs took his state vehicle everywhere. Though McElyea did not have every piece of the puzzle, he gathered enough information to form a good-faith belief that Cobbs violated state law.

It is also relevant that McElyea pointed to a specific law that he believed Cobbs violated. From his first report, McElyea was consistent in pointing to the state civil law governing use of state vehicles as the specific law that was violated by Cobbs. *Cf. Grabowski*, 922 S.W.2d at 956 ("Grabowski presented no evidence of a law he believed Constable Moore violated other than his department's internal policies. Indeed, Grabowski openly admitted that he could think of no traffic law violated by Constable Moore in the investigation of the accident."); *Donlevy v. City of The Colony*, 8 S.W.3d 754, 758 (Tex. App.—Fort Worth 1999, no pet.) ("Donlevy openly admitted . . . that she did not know . . . what law she believed Chandler had violated . . . .").

While the Department urges that McElyea should have done a more thorough investigation before alleging that Cobbs had misused his state vehicle, McElyea testified that Internal Affairs Division policy dictated that employees could not open investigations on other Division employees without McAuliffe's approval. Thus, once McElyea had information that caused him to reasonably believe that Cobbs was violating the law, McElyea brought it to McAuliffe's attention.

18

McAuliffe, after conducting a cursory review that uncovered a widespread problem, chose not to investigate further or take any disciplinary action.

The Department is attempting to impose a duty to investigate and to penalize McElyea for failing to investigate further. The Department's position would put McElyea between Scylla and Charybdis—if he fails to investigate, he is not protected from retaliation; if he does investigate, violating the direct orders of his superiors, he can be fired for insubordination. Particularly in a law-enforcement context, we do not want to encourage insubordination. Command structure must generally be followed to prevent grim or even disastrous consequences. We reject, to the extent that it is urged by the Department, an additional requirement that peace officers must launch unauthorized investigations before being able to trigger the protections of the whistleblower statute.

To the extent that the Department's position is that McElyea must have had hard evidence to conclusively prove each and every element of a violation of the statute prior to qualifying for whistleblower status, we know of no case that imposes such an onerous standard. To the contrary, in *Howard*, this Court extended whistleblower protection to an employee who sought "opinions" concerning the "legality/validity" of his employer's practices. 182 S.W.3d at 400. The *Howard* Court held that a good-faith report under the whistleblower statute includes "any disclosure of information" about a public employee's employer or coworker "*tending to directly or circumstantially prove* the substances of a violation of criminal or civil law." *Id.* at 399 (emphasis added). The whistleblower statute does not "require the use of specific phrasing in a whistleblower

19

report" or "require that a whistleblowing employee state his complaint in the affirmative, as opposed to reporting the matters in the form of a query." *Id.* at 400.

Overall, we hold that the information at McElyea's disposal was sufficient for his reports to provide him with whistleblower protection. The jury's conclusion that McElyea had sufficient information about Cobbs's use of his state vehicle to form a good-faith belief that Cobbs had violated the law is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust.

**The Law**

We now turn to the question whether an existing law prohibits the conduct reported by McElyea. The government code provides,

> (a) Except as provided by Subsection (b), an officer or employee of a state agency may not use a state-owned or state-leased motor vehicle except on official state business.

> (b) The administrative head of a state agency may authorize an officer or employee to use a state-owned or state-leased motor vehicle to commute to and from work when the administrative head determines that the use may be necessary to ensure that vital agency functions are performed. . . .

Tex. Gov't Code Ann. § 2113.013 (West Supp. 2006). Two Department policies concerning the use of state vehicles were introduced at trial. One largely tracks the statutory language:

> Employees shall not use State-owned or State-leased vehicles for any purpose other than official State business and in accordance with policy. The Executive Director may authorize an officer or employee to use a State-owned or State-leased motor vehicle to commute to and from work when the Executive Director determines that the use may be necessary to ensure that vital Agency functions are performed.

20

The other provides, in relevant part, that "State vehicles may be used for personal purposes only when . . . [t]he user is engaged in personal activity but is on call for emergencies that would require immediate transport to the workplace in the State vehicle."

McElyea stated that he "knew that there was a law about misuse of State vehicles because [he] had been in Internal Affairs for 17 years" and that he "personally approved investigations where employees were terminated and disciplined for misuse of a State vehicle, and [he] saw those employees from time to time get prosecuted for that." McElyea and Guinn both testified about another Division employee who was investigated for misuse of a state vehicle around the time that McElyea made his allegations about Cobbs. Guinn testified that "[t]he employee was disciplined and removed from his position and removed from a position where he had use of a state-owned vehicle."

McElyea testified that any use of a state vehicle for anything other than official state business or commuting to and from work with permission violates the government code. McElyea's belief is supported by the plain language of the statute. The testimony of John McAuliffe was consistent with McElyea's interpretation of the statute. McAuliffe testified that he never used his state vehicle for personal reasons even though he was on 24-hour call. Although he relied on a Department policy rather than the government code as the basis for this limitation, the policy on which he relied is the first of the two quoted above, which largely tracks the statutory language. The fact that McAuliffe interpreted the policy this way lends support to McElyea's interpretation of the government code provision that uses substantially similar language.

Cobbs testified at trial that he routinely used his state vehicle to travel to and from his off-duty job and that the off-duty job was not directly on the route between his office at the Department and his home. Mileage logs and time sheets introduced by McElyea at trial showed that Cobbs drove his state vehicle to work at his off-duty job even on days when he did not report for work at the Department because he took a holiday or sick time.

The Department urges that McElyea could not have reported misuse of a state vehicle in good faith because Cobbs and Rhea were on 24-hour call due to their membership in the Fugitive Task Force of the Office of the Inspector General and, therefore, were allowed to use state vehicles for personal reasons.[10] This statement is wholly inconsistent with the plain language of the government code. It also ignores the testimony of McAuliffe, who was the Inspector General at the time of McElyea's allegations, that "use of a state vehicle for personal reasons is certainly, first and foremost, a violation of the administrative rules with TDCJ," which required that "state vehicles are to be used for official use only." Even Moriarty testified in his deposition that any use of a state vehicle for anything other than official state business or, for those with approval, driving between the Department and an employee's home violates state law, although he testified differently at trial.

Regardless of what Department policy authorized, we hold that McElyea presented legally and factually sufficient evidence to support a finding that he reported a violation of the government code in good faith. His belief that a law had been violated is objectively reasonable because he had experience applying the statute at issue, his interpretation is consistent with the plain

---

[10] Under the Department's interpretation of its policies, Cobbs could have driven his family to Disneyland in his state-owned vehicle using state-purchased gas without suffering any adverse consequences.

22

language of the statute, and McAuliffe's interpretation of a substantially similar Department policy supported McElyea's interpretation.[11]

**Causation**

The Department urges that legally and factually insufficient evidence was presented at trial to support a finding that McElyea's report of a violation of law was causally connected to adverse personnel action taken against him. The supreme court has held that to show causation in a whistleblower claim, a public employee must demonstrate a but-for connection between his report of a violation of law and the adverse personnel action taken against him; in other words, he must show that he "suffered discriminatory conduct by his . . . employer that would not have occurred when it did if the employee had not reported the illegal conduct." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000).

Circumstantial evidence can be sufficient to establish a casual link between the adverse employment action and the reporting of illegal conduct. *Id.* at 69. Such evidence includes (1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report of the conduct, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the adverse employment action was false. *Id.* A plaintiff need not present evidence involving all five categories to prove causation. *See Continental Coffee*

---

[11] Because we hold that McElyea presented legally and factually sufficient evidence to support a finding that he reported a violation of the government code in good faith, we need not address the Department's contention that McElyea presented insufficient evidence to establish that he reported a violation of the Private Security Act in good faith.

23

*Prods. Co. v. Cazarez*, 937 S.W.2d 444, 452 (Tex. 1996). "But evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events." *Zimlich*, 29 S.W.3d at 69. McElyea presented evidence relevant to all five categories.

### Knowledge of the Report of Illegal Conduct

Although Moriarty testified that no allegation concerning misuse of state vehicles was ever brought to his attention, the jury was free to disbelieve that testimony and credit other evidence that suggested the opposite. McElyea testified that he reported Cobbs's misuse of a state vehicle in his initial oral report to McAuliffe; Internal Affairs Division director Guinn corroborated that testimony. Moriarty testified that McAuliffe discussed McElyea's allegations with him; Moriarty admitted that he was aware that McElyea had made allegations that Cobbs's conduct in connection with an off-duty job violated laws and Department policies. McAuliffe testified that Moriarty "was specifically the person assigned within the Office of Inspector General to review Internal Affairs employees' conduct" and that Moriarty "was the person that [he] dealt with on this issue face to face." McAuliffe made no secret of the fact that he intended to recommend Moriarty as the next Inspector General when he retired—witnesses testified that it was common knowledge within the Division that Moriarty would be the next Inspector General. Moriarty testified that he was tasked with getting information from Cobbs about the allegations. Cobbs testified that Moriarty informed him that the allegations had been made by McElyea. Guinn testified that the April 2001 interoffice communication concerning use of state vehicles that was distributed to all employees of the Office

24

of the Inspector General was a "direct follow-up" to McElyea's allegations about Cobbs's misuse of his state vehicle.

***Expression of a Negative Attitude Toward the Report***

Moriarty testified that McElyea's report was a "non-issue," but the jury was free to disbelieve that testimony and believe other evidence that indicated that Moriarty expressed a negative attitude toward the report. Claude Williams, McElyea's direct supervisor, testified that Moriarty went to his office "very angry" and "red in the face" and said, "You need to do something about McElyea." Moriarty told Williams that McElyea "needs to keep his nose out of things not his business and needs not to be writing IOCs on people that work for me" and instructed Williams to "[t]ell him he doesn't know who he's fucking with." McElyea testified that Moriarty told him on a Friday to "to pack [his] shit and get it out of the office by Monday." Moriarty also testified that McElyea was a "disloyal" employee.[12]

McElyea testified that McAuliffe was "flabbergasted" and "agitated" when McElyea made his allegations. Guinn testified that McAuliffe was "very agitated and upset" at McElyea's allegations. Williams testified that McAuliffe told him, referring to McElyea's allegations, that McElyea "needs to back off of that" because "Moriarty was going to be the next Inspector General." This testimony indicates that McAuliffe made it clear that McElyea had rocked the boat and that, as far as McAuliffe was concerned, trouble loomed ahead for him.

---

[12] Moriarty testified that McElyea was "disloyal" because he had "bad-mouthed" Moriarty. However, the jury was free to disbelieve that explanation and believe that Moriarty's characterization of McElyea as "disloyal" was a result of McElyea's reports. The jury was in the best position to judge the credibility of the witnesses.

*Failure to Adhere to Established Company Policies Regarding Employment Decisions*

Moriarty testified that he did not apply a veterans' preference in favor of McElyea when hiring the two multi-regional administrators. Witnesses testified that veterans were to receive preference over other applicants if they were equally qualified. Moriarty testified that although McElyea was equally qualified with the other two applicants on paper, it became clear after the interviews that McElyea was less qualified. McElyea testified that interviews were not to be taken into account in making the determination whether a veteran was equally qualified with other applicants. The Department's written policy, which was introduced at trial, is silent on whether interviews were to be taken into account in the determination. The jury was free to accept McElyea's interpretation of the veteran's preference policy.

Moriarty also testified that he did not retain his notes taken during the interviews for the multi-regional administrator positions; other testimony indicated that Moriarty destroyed his interview notes from the director of investigations interviews. McElyea introduced into evidence a Department policy requiring interview notes to be taken and retained. The Department's director of human resources, Carol Blair Johnston, testified that the selection policy does not apply where there has been a reduction in force and that "[w]e have a provision in the policy where we can make exceptions to the selection process." Johnston testified that human resources "can supplement and enhance [selection policies] where we're going through a reduction in force." The Department, however, produced no documentation to support Johnston's assertion. The jury was free to disbelieve Johnston's testimony and believe that the written policy introduced by McElyea correctly stated Department policy.

26

### *Discriminatory Treatment in Comparison to Similarly Situated Employees*

McElyea testified that after he was told that his position was being eliminated, he was not allowed to supervise employees, go to meetings, or review files. McElyea testified that the two other multi-regional administrators who were eventually chosen for the remaining positions were reviewing files and going to meetings during the same time period. Although those two employees were awarded the multi-regional administrator positions, the disparate treatment described by McElyea occurred before that decision was made.

### *Evidence that the Stated Reason for the Adverse Employment Action Was False*

Moriarty testified that he would have done whatever it took to ensure that McElyea was not awarded a job within the Internal Affairs Division. But Moriarty testified that McElyea's reports were a "non-issue"; Moriarty did not want to hire McElyea because he did not trust McElyea, because he thought that McElyea was disloyal, and because McElyea had been "bad-mouthing" him around the office. At his deposition, Moriarty testified that he could not identify any specific instance of "bad-mouthing"; at trial, Moriarty testified that he spoke with McElyea's secretary after his deposition and that McElyea's secretary informed him that McElyea "was bad-mouthing [Moriarty] and that he was upset about the reduction in force and was going to get [Moriarty]."

The jury, however, was free to disbelieve this testimony and believe other evidence suggesting that Moriarty failed to hire McElyea because of his reports about Cobbs. As mentioned above, Williams testified that Moriarty said that McElyea "needs to keep his nose out of things not his business and needs not to be writing IOCs on people that work for me" and "doesn't know who he's fucking with." Also, McElyea testified that he socialized with Moriarty and talked to him on

27

the phone frequently before McElyea made the allegations about Cobbs. McElyea said, "I did not speak to him and he did not speak to me between February 28th of 2001 and the day of the RIF meeting."

Because McElyea presented evidence that his superiors had knowledge of his reports of illegal conduct, expressed a negative attitude toward his reports, failed to adhere to established Department policies regarding employment decisions, discriminated against him in comparison to similarly situated employees, and asserted a false reason for the adverse employment action, the jury's conclusion that McElyea's reports of violations of law were causally connected to the adverse employment action taken against McElyea is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. We overrule the Department's issue.

## CONCLUSION

Having overruled the Department's issue on appeal, we affirm the trial court's judgment.

_____

Diane Henson, Justice

Before Chief Justice Law, Justices Puryear and Henson;
    Dissenting Opinion by Justice Puryear

Affirmed

Filed:   July 26, 2007