# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00161-CV

---

### Office of the Attorney General of Texas, Appellant

### v.

### James Blake Brickman, J. Mark Penley, David Maxwell, and Ryan M. Vassar, Appellees

---

### FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-006861, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

### O P I N I O N

This appeal concerns the application of the Texas Whistleblower Act[1] to the highest echelons of our State government. The legislature enacted the Act to ensure lawful conduct by those who direct and conduct State business; to correct violations of the law by government employers that harm the public good or society; and to protect public employees who promote these purposes. Crucially, this appeal also implicates the State's fundamental policies of governmental transparency and accountability. In light of these purposes and policies, we decline to adopt the interpretation of the Act proposed by the Office of the Attorney General of Texas (OAG), which would have the effect of stripping whistleblower protections from employees who might report misconduct by the thousands of elected officials throughout the State—particularly by those who direct and lead the agencies of this State.

---

[1] *See generally* Tex. Gov't Code §§ 554.001-.010.

Appellees James Blake Brickman, J. Mark Penley, David Maxwell, and Ryan M. Vassar are former high-ranking employees of the OAG.[2]  In late September 2020, they made reports to the Federal Bureau of Investigation, the Texas Rangers, and other law-enforcement authorities, alleging that they believed Texas Attorney General Ken Paxton and/or the OAG had or might be engaged in bribery; tampering with a governmental record; abuse of official capacity; bank fraud; obstruction of criminal investigations; obstructing, influencing, or impeding an official proceeding; tampering with a witness; money laundering; and violations of the Racketeer Influenced and Corrupt Organizations Act.[3]  They gave notice of those reports to the OAG on October 1, 2020, and by mid-November, all four had been fired.

After filing unsuccessful grievances with the OAG, appellees sued the OAG, asserting claims under the Act and seeking reinstatement.  The OAG filed a motion to dismiss under rule 91a, *see* Tex. R. Civ. P. 91a, arguing that the OAG's immunity from suit was not waived under the Act because appellees only claim to have reported unlawful acts "committed personally by the Attorney General, who is neither the 'employing governmental entity' nor 'a public employee,'" and had not alleged facts demonstrating that they made a good-faith report of illegal conduct to an appropriate law-enforcement authority.  *See* Tex. Gov't Code §§ 554.0035, .002(a) (governmental entity may not take adverse personnel action against public employee who reports in "good faith" violation of law by "employing governmental entity or another public employee" to appropriate law-enforcement authority).  The trial court denied the motion to

---

[2]  In 2019 and 2020, Brickman was Deputy Attorney General for Policy & Strategy Initiatives, Maxwell was Deputy Director and then Director of the Law Enforcement Division, Penley was Deputy Attorney General for Criminal Justice, and Vassar was Deputy Attorney General for Legal Counsel.

[3]  *See* Tex. Penal Code §§ 36.02, 37.10, 39.02; 18 U.S.C. §§ 1344, 1510(a), 1512(c)-(d), 1956, 1961, 1962.

dismiss, and the OAG filed this appeal under the statute that authorizes an interlocutory appeal from an order that "grants or denies a plea to the jurisdiction by a governmental unit."**[4]** Tex. Civ. Prac. & Rem. Code § 51.014(a)(8). As explained below, we affirm the trial court's denial of the OAG's motion to dismiss.

## STATUTORY FRAMEWORK AND STANDARD OF REVIEW

Under rule 91a, a party may move to dismiss a claim on the grounds that it has no basis in law, meaning that the allegations, taken as true, and inferences reasonably drawn from them, would not entitle the claimant to the relief he seeks, or that the claim has no basis in fact, meaning no reasonable person could believe the pleaded facts. Tex. R. Civ. P. 91a.1. "In ruling on a Rule 91a motion to dismiss, a court may not consider evidence but 'must decide the motion based solely on the pleading of the cause of action, together with any [permitted] pleading exhibits.'" *In re Farmers Tex. Cnty. Mut. Ins.*, 621 S.W.3d 261, 266 (Tex. 2021)

---

**[4]** The OAG challenged jurisdiction via a rule 91a motion rather than through a plea to the jurisdiction and then took an appeal under the statute that allows for an interlocutory appeal—which are generally disallowed—from an order that "grants or denies a plea to the jurisdiction by a governmental unit." Tex. Civ. Prac. & Rem. Code § 51.014(a)(8). We agree with our sister court, which, while recognizing the "useful analogy between a 91a motion and a plea to the jurisdiction," observed that courts should be "wary of turning analogy into actuality" because the two procedures have important differences. *Reaves v. City of Corpus Christi*, 518 S.W.3d 594, 605 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.). Not only is rule 91a "designed to allow for the dismissal of baseless claims, [while] the purpose of a plea to the jurisdiction is to defeat a cause of action without regard to whether the claims asserted have merit," a rule 91a ruling "must not be based on extrinsic evidence, whereas the trial court must consider extrinsic evidence if necessary to resolve a plea to the jurisdiction." *Id*. We agree that permitting "the blending of standards for 91a motions and pleas to the jurisdiction" could allow government defendants to challenge the existence of jurisdictional facts while "artfully avoid[ing] any responsive evidence," "foreclose[ing] appellants' ability to introduce evidence" while still challenging the pleadings on issues that "may be evidence-intensive and fact-specific." *Id*. Because we look to the substance of the OAG's arguments more than the vehicle used to assert them, the appeal may proceed pursuant to section 51.014(a)(8), but our review is limited to the pleadings, as required by rule 91a.6. *See City of Austin v. Liberty Mut. Ins.*, 431 S.W.3d 817, 822 n.1 (Tex. App.—Austin 2014, no pet.).

(orig. proceeding) (quoting Tex. R. Civ. P. 91a.6). We review a trial court's ruling on a rule 91a motion de novo. *Id*. The OAG sought dismissal based entirely on an asserted lack of jurisdiction, another issue we review de novo. *See City of Austin v. Liberty Mut. Ins.*, 431 S.W.3d 817, 822 (Tex. App.—Austin 2014, no pet.) (citing *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)); *see also San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 621 (Tex. 2021) (explaining that river authority sought dismissal under rule 91a on grounds of governmental immunity and then filed interlocutory appeal from denial under section 51.014(a)(8)). Because a rule 91a motion challenges the sufficiency of the pleadings, we determine whether appellees alleged facts demonstrating the trial court's jurisdiction to hear the case, looking to their intent and construing the pleadings in their favor. *See Miranda*, 133 S.W.3d at 226; *City of Austin*, 431 S.W.3d at 822.

Sovereign immunity protects the State and its political subdivisions from being sued unless the State has waived immunity or otherwise consented. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374-75 (Tex. 2006). The general rule is that "a statutory waiver of sovereign immunity must be construed narrowly," and the statutory language waiving immunity must be clear and unambiguous. *In re Smith*, 333 S.W.3d 582, 587 (Tex. 2011) (orig. proceeding). However, "[i]f a statute is curative or remedial in its nature the rule is generally applied that it be given the most comprehensive and liberal construction possible." *Burch v. City of San Antonio*, 518 S.W.2d 540, 544 (Tex. 1975); *see Traxler v. Entergy Gulf States, Inc.*, 376 S.W.3d 742, 744 -45 (Tex. 2012) (remedial and curative statute should generally be construed so it is "given the most comprehensive and liberal construction possible" and "certainly should not be given a narrow, technical construction" (quoting *City of Mason v. West Tex. Utils. Co.*, 237 S.W.2d 273,

4

280 (Tex. 1951))). This and other appellate courts have observed that the Act is a remedial statute and thus should be construed liberally. *See, e.g.*, *Texas Dep't of Crim. Just. v. McElyea*, 239 S.W.3d 842, 849 (Tex. App.—Austin 2007, pet. denied); *University of Houston v. Barth*, 178 S.W.3d 157, 162 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

The Act provides that a governmental entity may not suspend, terminate, or take other adverse personnel action against a "public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." Tex. Gov't Code §§ 554.0035, .002(a). A public employee who is subjected to adverse personnel action in violation of the Act may sue the employing governmental entity, the sovereign immunity of which is "waived and abolished to the extent of liability for the relief allowed" under the Act,[5] *id*. § 554.0035, and may seek injunctive relief, actual damages, attorney's fees, reinstatement, and lost compensation, *id*. § 554.003(a), (b).

We first summarize appellees' pleadings to decide whether the allegations are such that appellees may avail themselves of the protections of the Act or instead establish a lack of jurisdiction such that the trial court should have granted the OAG's motion to dismiss.

---

[5] This Court has refused to analogize the Act's waiver of immunity to the more limited waiver provided by the Texas Tort Claims Act. *Texas Bd. of Pardons & Paroles v. Feinblatt*, 82 S.W.3d 513, 521 (Tex. App.—Austin 2002, pet. denied) (comparing Texas Whistleblower Act with Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code §§ 101.001-.109). We noted that the Act "contains a broad waiver of immunity expressed in expansive language" while the Tort Claims Act provides a waiver that is "is limited in scope." *Id*. We also observed that the two statutory schemes serve "different purposes" and are "guided by different policy concerns," concluding that "[i]t is reasonable to expect that the legislature intended a broad waiver of immunity for whistleblower claims to accomplish" the Act's "important policies." *Id*. at 522.

This case involves the alleged relationship between Paxton and Nate Paul, who owns numerous real-estate-investment companies. Appellees alleged that Paul and a "political action committee of a law firm representing Nate Paul's interests" had each donated $25,000 to Paxton's campaign, that Paul had employed a woman with whom Paxton had a personal relationship, and that Paul or his entities had assisted in a "major remodeling project" at Paxton's home. Starting in 2019, at least sixteen of Paul's entities filed for bankruptcy protection; foreclosure proceedings related to more than twelve of his entities had begun; he was being investigated by the FBI and other law enforcement; and in August 2019, the FBI obtained warrants to search Paul's house and offices. Appellees alleged that starting in 2019, Paxton used OAG resources in Paul's favor and "improperly interfere[d] in [Paul's] civil disputes and criminal matters," and that his "abuse of the OAG to benefit Paul" increased in 2020, when he "became less rational in his decision making and more unwilling to listen to reasonable objections to his instructions." In their petition, appellees made detailed allegations about how Paxton acted or directed OAG staff to act on Paul's behalf, particularly in the areas of open-records requests, the OAG's intervention in a lawsuit, an opinion related to foreclosure, and investigations into Paul's adversaries, as summarized below.

### *Open-Records Issues*[6]

- Paul made an open-records request to the Texas State Securities Board seeking records related to the 2019 search of his properties, and the Board requested an OAG opinion about the request.[7] Paxton pressured then-Deputy First Assistant AG Ryan Bangert to

---

[6] *See generally* Tex. Gov't Code §§ 552.001-.353 (Public Information Act).

[7] When a governmental entity wishes to withhold information, believing it to be within an exception to public disclosure, and if there is no previous determination about whether the

issue an opinion allowing the records to be released—"a highly unusual move that was contrary to well-established precedent related to protecting the integrity of criminal investigations." Despite Paxton's efforts, the OAG issued an opinion stating that the records were not all subject to disclosure due to the pending criminal investigation.

- In March 2020, Paul made another request for records related to the search, this time to the Texas Department of Public Safety (DPS). The FBI filed a brief urging the OAG to "follow its longstanding practice of not providing documents related to an ongoing investigation" and sent Paul a redacted copy. Paxton "tried to help Paul get the unredacted brief," contacting Vassar several times to pressure him to issue an opinion favorable to Paul, "direct[ing]" him to "find a way to release the information," and saying he "did not want to use the OAG to help the FBI or DPS in any way." Vassar, however, thought Paxton's directives "would overturn decades of settled expectations among sister law enforcement agencies, compromise the OAG's own law enforcement information, and likely spark innumerable lawsuits challenging the newly announced application of the law." Paxton "personally took" the OAG's file related to the search, "which included documents sealed by a federal court," kept it for about a week, and later directed that the OAG opinion should "take no position on whether the documents should be released."

- In May 2020, Paul made a third open-records request, seeking the unredacted FBI brief from the OAG. Paxton asked Vassar for a copy of the unredacted brief, directed him "to find a way to release" the brief, and directed Vassar to release an OAG opinion that "ultimately concluded that the unredacted FBI brief must be released."

### OAG Intervention in a Charity's Lawsuit[8]

- A lawsuit between several of Paul's entities and the Roy F. and Joann Cole Mitte Foundation, which had invested with Paul, resulted in the appointment of a receiver over several of Paul's entities, and the OAG Charitable Trust Division initially declined to intervene because the foundation was well represented and its interests were protected. Paxton took a "deep personal interest" in the case and despite being advised that the OAG should not intervene, insisted that the OAG intervene "for the purpose of exerting pressure on the Mitte Foundation to settle on terms favorable" to Paul.

---

information fits into an exception, the entity must ask the Attorney General for a decision about whether the information may be withheld. *Id*. § 552.301.

[8] The OAG's Charitable Trust Division has the authority to intervene in litigation involving charities: "For and on behalf of the interest of the general public of this state in charitable trusts, the attorney general is a proper party and may intervene in a proceeding involving a charitable trust." Tex. Prop. Code § 123.002; *see generally id*. §§ 123.001-.006 (Attorney General Participation in Proceedings Involving Charitable Trusts).

7

- Brickman reviewed the pleadings and again informed Paxton that the OAG "had no interest in the case and should not waste resources of the OAG participating" in the dispute, but "Paxton did not waver in his desire to bring the power and resources of OAG to bear" to help Paul. "So intense and bizarre was Paxton's desire to help Nate Paul," that Brickman and then-First Assistant AG Jeff Mateer "had to talk Paxton out of personally attending and appearing" before the trial court, which would have been "unprecedented" given that Paxton "has not appeared in any court on behalf of the OAG in the memory of any of [appellees], if he ever has." The Charitable Trust Division withdrew from the case several months later.

### *OAG Opinion on Foreclosure*[9]

- Paxton asked Bangert to research whether COVID restrictions on in-person gatherings should prevent foreclosure sales. Paxton "made clear that he wanted OAG to express a specific conclusion: that foreclosure sales should *not* be permitted to continue." Appellees said that Paxton was "adamant" about his position and characterized his personal interest in the issue as "surprising" and "bizarre." "Even more bizarre was the speed and timing of the release of the opinion Paxton sought": the OAG released the opinion requested by Paxton at about 1:00 a.m. on Sunday, August 2, 2020, three days after Paxton's initial request for research, and "[u]nbeknownst to" appellees, the opinion had the effect of stopping several August 4 foreclosure sales of Paul's properties.

### *Investigations into Paul's Adversaries*

- In May 2020, Paxton arranged and attended a meeting between Paul and the Travis County District Attorney's Office. Paul provided a criminal complaint accusing individuals involved in the 2019 search of Paul's home and offices—federal and state law-enforcement officers, the federal magistrate judge who signed the search warrants, and an Assistant U.S. Attorney—of violating his rights.

- The Travis County DA referred Paul's complaint to the OAG, as Paxton had expected, and Maxwell and Penley were assigned to investigate. After forensics experts determined that there was "no credible evidence" to support Paul's allegations, Maxwell and Penley informed Paul of that fact. Paxton then met with Maxwell, Penley, and Paul and "pushed back" against the recommendation to close the investigation.

- In August 2020, Paxton asked Vassar how the OAG retains outside counsel, and Vassar explained that the process requires several stages of review and authorization by at least ten OAG personnel. About a week later, Paxton asked whether the OAG can retain outside counsel to investigate criminal allegations. Despite Vassar's cautions, Paxton

---

[9] *See generally* Tex. Gov't Code §§ 402.041-.045 (Attorney General, Opinions).

asked him to contact two candidates: "a veteran former state and federal prosecutor with decades of experience" and Brandon Cammack, "a Houston criminal defense attorney who had been licensed only 5 years and never served as a prosecutor."

- A week later, Paxton decided to retain Cammack, the less experienced attorney, and instructed Vassar to draft a contract "immediately" because he thought the new Travis County DA might rescind the referral to the OAG. On September 4, Vassar sent the draft contract to the General Counsel Division for review.

- In late September, Cammack asked for an OAG email address or "some other official documentation to identify himself as" working for the OAG, and Vassar explained that the contract was not yet approved. Paxton then asked Vassar why the contract had not been approved and said he was "tired of his people not doing what he had asked." The next day, Penley (the Deputy AG for Criminal Justice) refused to approve the contract because of a lack of credible evidence supporting Paul's claims. "On Saturday, September 26, 2020, Paxton asked Penley to meet him in McKinney[, Texas]," where he pressured Penley to approve Cammack's contract. Penley reiterated that he "could not in good conscience approve the contract" because there was "no factual basis for the absurd investigation ordered by Nate Paul of the FBI agents and federal prosecutor involved in obtaining search warrants for Paul's home and offices."

- The contract, which appellees assert was never approved through the proper OAG channels, was attached to appellees' petition. It lacks an "OAG Contract No.," for which there is a blank at the top of the first page, but is signed by Cammack and Paxton and states that Cammack's duties as "Outside Counsel" were to begin on September 3. The contract explains that the OAG had been referred a criminal complaint and that Cammack should "conduct an investigation, under the authority of the OAG," and "prepare a report documenting any potential criminal charges that may be discovered."

- Cammack started to work at Paxton's direction, "falsely represent[ing] that he was a 'special prosecutor' in order to obtain grand jury subpoenas under false pretenses to investigate, harass, and intimidate Nate Paul's perceived adversaries." In late September, Cammack obtained thirty-nine subpoenas from the Travis County Grand Jury "by falsely claiming he was a 'Special Prosecutor' authorized to represent OAG."[10] He was accompanied by Paul's attorney when he served at least some of the subpoenas.

---

[10] Appellees included a copy of one of the subpoenas, asking that documents be sent to "Brandon R. Cammack, Special Prosecutor for the Office of the Attorney General," and signed:

KEN PAXTON
Texas Attorney General
By: /s/ Brandon R. Cammack
Brandon R. Cammack
Special Prosecutor
Office of the Attorney General

- Appellees also alleged that Cammack's investigation exceeded the scope of the referral because he looked into a new request by Paul, which "assert[ed] a wild conspiracy theory." Thus, appellees asserted, "not only was Cammack never properly approved under OAG policies to conduct any investigation in the first place and never had the title or powers of a prosecutor, he was now obtaining subpoenas under false pretenses to conduct an investigation that was never in the scope of his asserted contract with OAG," all done "at the direction of OAG and Ken Paxton to benefit Nate Paul and Ken Paxton."

### *Report to Appropriate Authorities and Immediate Retaliation*

- In late September, appellees learned that "Paxton was causing OAG to use the grand jury process and the subpoenas obtained under false pretenses to investigate and intimidate Nate Paul's perceived financial adversaries," as well as law-enforcement officers and federal prosecutors who had been involved in the 2019 search. The subpoenas sought "personal information such as [the individuals'] personal cell phone information and were clearly designed only to harass and intimidate the law enforcement officers."

- During the last week of September 2020, appellees "talked frequently about what each of them knew about the various actions Paxton and OAG were taking to benefit Nate Paul and Ken Paxton personally." Because several divisions had been involved, "not every [appellee] knew the whole picture" until they discussed the situation. At that point, "each of the [appellees] formed a good faith belief that Paxton and OAG had violated Texas and federal criminal law, including but not limited to laws regarding bribery, tampering with government records, obstruction of justice, harassment, and abuse of office." Appellees explained that "Paxton's decisions, opinions, and exercise of discretion described in detail above were far removed from the bounds of what an ordinary, prudent civil servant would do" because they "were all ostensibly for the benefit of" Paul, who was "under FBI investigation and caught in a maelstrom of business failure and litigation," was "a major donor to Paxton's campaign," was assisting Paxton in remodeling his home, and had employed the woman with whom Paxton had an extramarital relationship. Appellees thus stated that they "reasonably believed Paxton's bizarre abuse of his office was the result of bribery."

- On September 30, Brickman, Penley, Vassar, and several other whistleblowers went to the FBI to report their good-faith beliefs that Paxton and the OAG had violated the law. Maxwell was not able to attend the meeting, so he made a separate report to the Texas Rangers and later made reports to the FBI and the Travis County DA's Office.

- On October 1, seven whistleblowers—Brickman, Vassar, Penley, Mateer, Bangert, and two others—sent a letter to the OAG Director of Human Resources, providing notice about their report to the FBI. Maxwell did not sign the letter because he was out of state, so he sent his own letter about his report.

10

- On October 2, Paxton directed that Penley and Maxwell should be placed on "investigative leave"; they were fired on November 2. Mateer resigned, and Brent Webster was appointed to replace him as First Assistant AG. On October 5, Webster started taking actions intended to embarrass and intimidate Brickman such as taking away his duties, ordering him out of an important meeting, demanding to speak with him alone or with an armed peace officer present, and ordering him to leave his personal cell phone in his car; Brickman was fired for insubordination about two weeks later after he expressed concerns about ongoing OAG work on Paul's behalf despite public statements by Paxton that the agency had concluded its investigation into Paul's complaints. On October 19, Vassar was placed on investigative leave and walked out of the building by security; he was fired on November 17 "for false and pretextual reasons." Finally, one other whistleblower was fired on October 20, and another two resigned in late October after being harassed and humiliated.

- Meanwhile, on October 3, the OAG issued a statement asserting that the whistleblowers sought "to impede an ongoing investigation into criminal wrongdoing by public officials including" OAG employees. According to appellees, the statement was "blatantly false," there was no such investigation, and the statement and several others issued later by the OAG were intended to intimidate, discredit, and retaliate against the whistleblowers.

### DISCUSSION

The OAG asserts that appellees did not state a viable claim under the Act because they did not establish that they fit within the Act's "narrow immunity waiver." Specifically, the OAG argues that appellees did not allege (1) that a governmental entity or public employee had violated the law, (2) that they made a cognizable report of a good-faith belief of a violation of law, or (3) that they each made a report to an appropriate law-enforcement authority.

*Did appellees allege misconduct by a governmental entity or public employee?*

We start with the OAG's argument that appellees only reported alleged violations of the law by Paxton, who, as elected head of the agency, can be considered neither a "governmental entity" nor a "public employee" under the Act, which defines a "public employee" as "an employee or appointed officer other than an independent contractor who is

11

paid to perform services for a state or local governmental entity." Tex. Gov't Code § 554.001(4). The parties do not dispute that appellees were "public employees" or that the OAG is a "state governmental entity." The OAG insists, however, that Paxton, as the Attorney General and head of the OAG, cannot be considered either "the employing governmental entity or another public employee" and, therefore, that appellees' claims do not fall within what the OAG characterizes as the "narrow waiver" of immunity provided by the Act. *See id*. §§ 554.001(4), .002(a). Because appellees' allegations of misconduct all arise from Paxton's conduct, the OAG contends, appellees cannot show a waiver of immunity under the Act.

Although appellees' allegations of ill motive—motives that would turn otherwise authorized acts into violations of the law—are specific to Paxton (i.e., appellees do not argue that the OAG itself or any other OAG actor was acting out of a personal motivation to improperly help Paul), appellees do in fact allege that the OAG itself, through its official actions carried out at Paxton's direction, committed acts improperly intended to benefit Paul and/or Paxton. As the OAG says, the gravamen of appellees' allegations is Paxton's misconduct, but appellees included allegations that *the office itself* committed misconduct on Paxton's instruction: the OAG improperly intervened in the Mitte Foundation's lawsuit against Paul; improperly contracted with Cammack, who then improperly obtained grand-jury subpoenas; and issued an opinion that had the effect of helping Paul avoid foreclosure sales. Those actions were official acts by the office itself, meaning that appellees reported violations of the law by their employing governmental entity and may therefore avail themselves of the protections of the Act. *See Texas Health & Hum. Servs. Comm'n v. Pope*, No. 03-19-00368-CV, 2020 WL 6750565, at *7 (Tex. App.—Austin Nov. 18, 2020, pet. filed) (mem. op.) (whistleblowers fell within Act because they

12

reported that company with which HHSC had contracted was violating legal requirements for transporting minors to medical appointments).[11]

In addition, we disagree with the OAG's contention that Paxton's actions, taken in his official capacity, cannot be viewed as actions of the agency.[12] "An organization takes action through its agents." *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 853 (Tex. 2011) (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997)). In the context of imposing corporate liability for an officer's decisions, the supreme court has explained that "acts of a vice-principal are deemed to be acts of the corporation for purposes of exemplary damages because the vice-principal 'represents the

---

[11] The OAG insists that it cannot be viewed as having committed any violation under the Act because appellees' allegations of misconduct turn on a corrupt mens rea on Paxton's part. However, at least one of the acts reported by appellees—the OAG's contracting with Cammack—falls almost exactly into the kind of whistleblowing discussed in *Texas Health & Human Services Commission v. Pope*, No. 03-19-00368-CV, 2020 WL 6750565, at *7 (Tex. App.—Austin Nov. 18, 2020, pet. filed) (mem. op.). In that case, the whistleblowers reported that a company with which the agency had contracted was violating various legal requirements, which meant there was "at least a fact issue as to whether [whistleblowers] had a good-faith belief that HHSC had violated the law" because the agency "had a legal obligation to ensure" that the company complied with the law. *Id*. In this case, appellees alleged that the OAG had entered into a contract that was never approved through the OAG's approval process, resulting in Cammack's procurement of grand jury subpoenas under false pretenses. Appellees thus alleged at least one act by the OAG that violated a law, defined by the Act as a state or federal statute, a local governmental entity's ordinance, or a rule adopted under a statute or ordinance. *See* Tex. Gov't Code § 554.001(1).

[12] The OAG asserts that to view conduct by Paxton (or an assistant AG acting at Paxton's request) as action by the agency would render superfluous part of section 554.002(a), which prohibits an agency from acting against an employee who reports a violation by the employing entity *or* another public employee. *See id.* § 554.002(a). We disagree. It is not hard to conceive of a situation in which an official or employee might violate the law within the context of his employment but in a manner that could not be attributed to the employing entity, such as unauthorized use of a state vehicle or theft of the entity's funds or property. In the situation before us, however, the alleged misconduct was Paxton's acts and directives in his official capacity as head of the OAG that caused or attempted to cause the agency to act improperly.

13

corporation in its corporate capacity.'" *Bennett v. Reynolds*, 315 S.W.3d 867, 883 (Tex. 2010) (quoting *Hammerly Oaks*, 958 S.W.2d at 391). A vice-principal is someone who represents a corporation "in its corporate capacity, and includes persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a department or division of his business.'" *Id.* (quoting *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999)).

Governmental agencies similarly act by way of the people who run or are employed by the agencies. "An employee's actions taken pursuant to his duties and authorized by state law are considered actions taken by the State," and courts have held that for whistleblower purposes, the acts of an appointed officer that fall within the authority of his office, even if he misuses that authority, "should be construed as acts of the employing governmental entity."[13] *Housing Auth. of City of El Paso v. Rangel*, 131 S.W.3d 542, 547-48 (Tex. App.—El Paso 2004, pet. granted by agr., judgm't vacated w.r.m.); *see also Familias Unidas v. Briscoe*, 619 F.2d 391, 403 (5th Cir. 1980) ("Actions for damages against a party in his

---

[13] The OAG observes that underlying the concept of sovereign immunity is "the premise . . . that the State is not responsible for unlawful acts of officials." *See Patel v. Texas Dep't of Licensing & Regul.*, 469 S.W.3d 69, 76-77 (Tex. 2015) (ultra vires claim "must allege that a state official acted without legal authority or failed to perform a purely ministerial act, rather than attack the officer's exercise of discretion"). The OAG's observation, however, seems to conflate the Act's statutory waiver of immunity with the doctrine of ultra vires. In an ultra vires action, brought against a government official in his official capacity, the plaintiff must allege and prove that the official acted without legal authority or failed to perform a purely ministerial act. *See id.* (citing *Texas Dep't of Ins. v. Reconveyance Servs., Inc.*, 306 S.W.3d 256, 258-59 (Tex. 2010); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372-73 (Tex. 2009)). An ultra vires act does not implicate sovereign immunity because it does not seek to control *State* action, and the governmental entity remains immune from suit because an official's unlawful act is not an act of the State. *See id.* In determining whether appellees have met their burden of pleading claims that fall within the Act, we will not presume, as the OAG seems to suggest, that the legislature intended to insert principles of ultra vires into the Act. A suit under the Act is not transformed into an ultra vires suit by virtue of the fact that the reported violations of law might also be pled as ultra vires acts against Paxton personally.

14

official capacity are, in essence, actions against the governmental entity of which the officer is an agent."); *Camacho v. Samaniego*, 954 S.W.2d 811, 818 (Tex. App.—El Paso 1997, writ denied) ("A county employee's actions taken pursuant to his duties and authorized by State law are considered actions taken by the State of Texas."); *Tarrant County v. Bivins*, 936 S.W.2d 419, 422 (Tex. App.—Fort Worth 1996, no writ) ("Sheriff Williams is a part of the County's government when he is acting in his official capacity."); *Wichita County v. Hart*, 892 S.W.2d 912, 929 (Tex. App.—Austin 1994) ("We hold that the sheriff is a part of the County's government when he is acting in his official capacity, and consequently the County is liable for his misdeeds."), *rev'd on other grounds*, 917 S.W.2d 779 (Tex. 1996); *cf. City of Cockrell Hill v. Johnson*, 48 S.W.3d 887, 896-97 (Tex. App.—Fort Worth 2001, pet. denied) (because alderman's alleged illegal conduct was not undertaken in his official capacity, "he was not part of the City's government when he committed the alleged legal violations," and thus Act did not apply).

"The Attorney General is a constitutionally created office" that is responsible for representing the State in lawsuits and giving written legal advice when requested by certain State officials. *Veterans of Foreign Wars v. Abbott*, No. 03-02-00447-CV, 2003 WL 21705376, at *2 (Tex. App.—Austin July 24, 2003, no pet.) (mem. op.) (quoting Tex. Const. art. IV, § 22). The Attorney General's duties and powers include the authority to employ peace officers as investigators, the prosecution and defense of certain appellate actions, and the provision of assistance in certain criminal prosecutions. *Id.* This Court has said that "how the Attorney General makes his legal determinations and runs his office" should be left to his discretion and that he "enjoys broad powers and is entrusted to develop legal interpretations and represent the State." *Id.* at *3. Paxton thus has the authority to determine the OAG's priorities and policies, to

decide how people in the OAG's employ should accomplish those priorities, and to require them to follow his orders. *See Terrazas v. Ramirez*, 829 S.W.2d 712, 721 (Tex. 1991) ("The Attorney General, as the chief legal officer of the State, has broad discretionary power in conducting his legal duty and responsibility to represent the State."). Indeed, the OAG, in asserting that Paxton is answerable only to the voters, notes that it is he who has the ultimate authority over the OAG, placing heavy emphasis on the fact that Paxton acts as the sovereign within his office.

The alleged misconduct was Paxton's own behavior or acts by others at the OAG at his direction—acts taken and directives given in his role as the head of the agency.[14] In other words, appellees alleged that in Paxton's official leadership of the agency, he violated the law and caused the agency to do so as well. Given that (1) an agency cannot act on its own and (2) Paxton has the ultimate authority to decide how the OAG acts, his official actions and directives, which appellees allege were motivated by greed and graft and which guided the actions taken by the OAG and its agents, can be viewed as the decisions of the OAG itself.[15]

---

[14] In several cases, courts of appeals have considered reports of illegal conduct by elected officials to fall within the Act, although the argument made by the OAG here was not discussed. *See, e.g.*, *Perez v. Cameron County*, No. 13-17-00581-CV, 2018 WL 6219630, at *5 (Tex. App.—Corpus Christi–Edinburg Nov. 29, 2018, no pet.) (mem. op.) (chief deputy clerk sought whistleblower protection when she was fired after reporting that elected county clerk had awarded improper and illegal contracts and had engaged in bribery and abuse of official capacity); *City of Bertram v. Reinhardt*, No. 03-14-00296-CV, 2015 WL 4899946, at *4 (Tex. App.—Austin Aug. 12, 2015, no pet.) (mem. op.) (city employee sued under Act when she was fired after reporting that mayor had instructed her to falsify reports); *see also Dallas County v. Gonzales*, 183 S.W.3d 94, 101 (Tex. App.—Dallas 2006, pet. denied) (county asserted that elected constable was not public employee but did not argue that "violations of law by an elected constable are not those of the 'employing governmental entity'").

[15] Because appellees sufficiently alleged a report of misconduct by the OAG, we need not decide whether Paxton can also be considered a "public employee" under the Act. However, we question whether the answer to that question is as plain as the OAG asserts. The OAG insists that by specifically including appointed officers, the legislature impliedly excluded elected officers. However, there are appointed officers who are paid and appointed officers who are not,

According to the OAG, Paxton and other elected officials who work full-time for the State at its highest levels can be considered neither the agencies that they direct nor employees of the State, leading to the result that illegality committed by elected officials cannot give rise to whistleblower protections when reported by employees. Under that interpretation, if an elected official's second-in-command engages in sexual harassment, takes a bribe, or steals from the State's coffers, and a public employee reports the illegal conduct to an appropriate authority, the employee is protected from employment retaliation under the Act. However, if the elected official himself, whether the Attorney General, a city councilperson, or a Texas Supreme Court justice, commits identical illegal acts and is reported, that official can terminate the reporting employee in direct and open retaliation, and the employee is without the protections of the Act. The OAG argues that the legislature might have intended such an outcome, purposefully carving elected officials out of the Act because accountability from the voters "is a powerful check on official conduct." However, officers like the Attorney General stand for election only once every four years, *see* Tex. Const. art. IV, § 23, while other elected officials go before the voters every two or even six years. Further, although the legislature can censure an

and given that the statutory language carries ambiguity as to the legislature's intent— bearing in mind the purpose of the Act as "a broad remedial measure intended to encourage disclosure of governmental malfeasance and corruption," *City of Waco v. Lopez*, 259 S.W.3d 147, 154 (Tex. 2008)—it seems reasonable to conclude that the legislature intended the statute to be more inclusive, sweeping up appointed officials whose bad acts might otherwise not fall within the ambit of the Act, rather than less, *see Texas Dep't of Hum. Servs. v. Green*, 855 S.W.2d 136, 142 (Tex. App.—Austin 1993, writ denied) (superseded by statute on other grounds) ("A liberal construction does not restrict the statute, but enlarges its scope and effect to effectuate the true legislative purpose." (quoting *Castaneda v. Texas Dep't of Agric.*, 831 S.W.2d 501, 503 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied)). Paxton is paid a salary out of the State's coffers, works full-time for the State, has opted into benefits under the Employees' Retirement System, and, as the OAG emphasizes, is selected for the job by the voters—in a sense, he is "hired" by the voters to work for the State and arguably should be considered a "public employee" for purposes of the Act.

elected officer or deduct from his salary for neglect of duty, under the OAG's interpretation, an employee who knows of significant abuses of power might be less willing to report the illegal conduct if her job is not protected, meaning it becomes less likely that the official's misconduct will ever come to the voters' or the legislature's attention in the first place. Moreover, given that the individuals the OAG's interpretation would carve out from the Act are those who serve at the apex of their respective agencies or branches of government, they have greater potential to engage in acts that, unchecked, might violate the law and the trust of the public. Thus, their unique position as elected officials arguably compels a conclusion that whistleblower protections should apply to their misconduct with greater force than to misconduct down the chain of power.

In our consideration of this case, we cannot ignore the purpose of the Act as "a broad remedial measure intended to encourage disclosure of governmental malfeasance and corruption," *City of Waco v. Lopez*, 259 S.W.3d 147, 154 (Tex. 2008), or the "consequences of a particular construction," Tex. Gov't Code § 311.023(5). We should also consider the context in which the Act was enacted[16] and the State's fundamental policies of governmental transparency and accountability.[17] The OAG's proposed outcome runs squarely against the Act's purpose of

---

[16] *See Neighborhood Ctrs. Inc. v. Walker*, 544 S.W.3d 744, 747 (Tex. 2018) (Act was adopted "amidst a growing sense throughout the country that mismanagement in the public sector is inherently a matter of public concern, and that employees who disclose mismanagement deserve legal protection," (quotation omitted), but legislature has since been "cautious in expanding protections," declining "to create a common-law cause of action for all whistleblowers").

[17] *See Paxton v. Texas Dep't of State Health Servs.*, 500 S.W.3d 702, 705 (Tex. App.—Austin 2016, no pet.) (stating in context of Public Information Act that it is "a fundamental policy of this State" that in delegating authority, voters "'do not give their public servants the right to decide what is good for the people to know and what is not good for them to know,' but 'insist on remaining informed so that they may retain control over the instruments they have created,'" and thus are "entitled 'to complete information about the affairs of government and the official acts of public officials and employees'" (quoting Tex. Gov't Code § 552.001(a)).

"securing lawful conduct on the part of those who direct and conduct the affairs of public bodies" and correcting "public employers' violations of the law that are detrimental to the public good or society in general." *Johnson*, 48 S.W.3d at 896; *see McElyea*, 239 S.W.3d at 849 (Act is intended "to enhance openness in government" and "to secure lawful conduct on the part of those who direct and conduct the affairs of government").

We decline the OAG's invitation to hold that by choosing somewhat ambiguous language, the legislature hid in the Act an implied exclusion that would lead to the extreme consequence of excluding from whistleblower protection employees who report misconduct by any of the *thousands* of elected officials—the very officials who control this State's numerous governmental entities, a result in direct opposition to the purposes of the Act and overall State policies of transparency and accountability. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (unambiguous statutory language text is determinative of legislative intent "unless enforcing the plain language of the statute as written would produce absurd results"); *see also In re Christus Santa Rosa Health Sys.*, 492 S.W.3d 276, 280 (Tex. 2016) (orig. proceeding) ("If the statute is unambiguous, we apply the words according to their common meaning, but we may consider the objective of the law and the consequences of a particular construction."); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001) (even if statute is "not ambiguous on its face," courts can consider factors such as object sought to be obtained, circumstances of enactment, and consequences of proposed construction). We hold that appellees sufficiently alleged illegal conduct by their employing governmental entity as contemplated by the Act.

19

*Did appellees report violations of law?*

The OAG further argues that testimony provided by former-First Assistant Attorney General Mateer "demonstrates an initial—and fatal—flaw in [appellees'] claim: they reported their speculation that a crime would occur, not an actual crime." It insists that "Mateer's testimony confirms that he and his colleagues reported only speculation about what could happen if they took the course of action" required by Paxton.

First, as we have already observed, the OAG chose to bring its jurisdictional arguments by way of a rule 91a motion, under which a court "may not consider evidence in ruling on the motion and must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits." Tex. R. Civ. P. 91a.6. We thus consider only appellees' allegations of violations of law without regard to any testimony provided by Mateer.

We disagree with the OAG's assertion that appellees only alleged that they reported "simple departure[s] from '[l]ongstanding OAG precedent and sound principles.'" Appellees leveled allegations of numerous instances of improper or illegal conduct, not mere changes in precedent or policy. Further, appellees alleged that they reported to law enforcement "what they collectively knew," saying that the whistleblowers (other than Maxwell) reported details of the alleged misconduct to the FBI, answering questions and going "around the room telling what they knew, what they'd heard, what they had observed, and the reasonable inferences that could be drawn from known facts." Appellees stated that they:

> reported to the FBI how Paxton and OAG intervened in Open Record Requests to help Nate Paul, intervened in civil litigation to help Nate Paul at the expense of a local charity, directed a legal opinion on foreclosure sales to help Nate Paul, and used OAG as a hammer to help Nate Paul by aiming a campaign of harassment and intimidation at Paul's perceived adversaries, all as described in detail above.

20

> [Appellees] reported facts to the FBI, not legal conclusions, as would be expected in an interview with FBI. But the three [appellees] who attended that meeting made very clear that they believed Paxton's and OAG's conduct were acts of criminal bribery, harassment, and abuse of office.

They pled similarly as to Maxwell, saying that he separately reported the alleged misconduct by Paxton and the OAG to the Texas Rangers and later to the Travis County DA.

Appellees pled numerous allegations of violations of federal and state laws by Paxton in his official capacity, which we have already held can be viewed as conduct by the OAG. Those acts had already occurred when appellees began to discuss Paxton's "bizarre" behavior, at which point it became clear to them that Paxton had employed personnel and divisions throughout the OAG to misuse State resources to benefit himself and Paul. Appellees further explained how those discussions led them in good faith to conclude that Paxton and the OAG had engaged in bribery, falsification of governmental records, abuse of office, obstruction of criminal investigations, and tampering with witnesses; and they pled that they then reported that misconduct to law enforcement. The fact that appellees do not identify a specific offer or solicitation of a bribe or the details of a specific quid pro quo arrangement between Paxton and Paul does not mean that appellees, given their knowledge of the law, how the OAG generally operates, and Paxton's usual behavior, could not have concluded that Paxton's unusual behavior in matters that benefited Paul was the result of bribery or some other form of corruption and reported that conclusion to law enforcement.

Even if we considered Mateer's testimony,[18] we disagree with the OAG's characterization of the testimony or the conclusions that must be drawn from it. The bulk of the evidentiary hearing was taken up by the OAG's objections on grounds of hearsay, speculation, confidentiality, and attorney-client or other privileges. Mateer at one point asked to "weigh in as an attorney, not the witness," opining first that at the time he made his report to the FBI, he was in a position to waive the OAG's privilege and that if waiver required Paxton's assent, it "would mean that the Attorney General could never be investigated ever for any crime no matter whatever he did." Mateer further said that he believed he should be allowed to testify under the crime-fraud exception, saying that "if asked questions, I think I could explain why I do believe, because I do believe that the deputies, had they gone down this path, would be put in a position to assist and/or cover up with what—what would—would be a crime." Asked if he had "come to believe that the Office of Attorney General was being engaged in ongoing criminal activity in connection with Nate Paul," he answered, "[I]t's hard to give a yes or no, so that makes it

---

[18] The trial court held a combined hearing on the OAG's rule 91a motion and appellees' request for a temporary injunction. After the trial court said that it would take the motion to dismiss under advisement and that it would proceed with the hearing on appellees' application for temporary injunctive relief, the OAG objected that the hearing should be stayed because it had just filed a notice of appeal under section 51.014(a)(8) from the court's implicit denial of the motion to dismiss and a petition for writ of mandamus. The trial court stated that it had not implicitly denied the OAG's motion and allowed appellees to call Mateer to testify, followed by the beginning of Vassar's testimony. That evening, after the hearing had concluded for the day, this Court issued a temporary stay, staying the remainder of the hearing. *See In re Office of the Att'y Gen.*, No. 03-21-00096-CV, 2021 WL 786781, at *1 (Tex. App.—Austin Mar. 1, 2021, order). Once this Court dismissed the OAG's attempted appeal, denied the petition for writ of mandamus, and dissolved the temporary stay, *see Office of the Att'y Gen. v. Brickman*, No. 03-21-00101-CV, 2021 WL 955274, at *1 (Tex. App.—Austin Mar. 12, 2021, no pet.) (mem. op.); *In re Office of the Att'y Gen.*, No. 03-21-00096-CV, 2021 WL 955278, at *1 (Tex. App.—Austin Mar. 12, 2021, orig. proceeding) (mem. op.), the trial court signed an order denying the OAG's motion to dismiss, and the OAG immediately filed this appeal from that order. Thus, the only witnesses who were able to testify, even in part, were Mateer and Vassar, and that partial testimony can hardly be viewed as the definitive statement of what evidence appellees could provide as to their beliefs about illegal acts that had already occurred.

22

difficult for me as—as—as the witness. What I would say is it—it could have led to that. Certainly it's—did I have concerns? I had potential concerns." It is those statements about "it could have led to" and "had they gone down this path" to which the OAG points.

However, Mateer also testified that he and the other whistleblowers "had a good-faith belief that the Attorney General was violating federal and/or state law, including prohibitions relating to improper influence of use of office, bribery, and other potential criminal offenses." Mateer testified that he had raised his concerns with Paxton himself, that Penley and Maxwell had told Mateer that they too had concerns "about potential unlawful conduct by Ken Paxton," and that when he learned in 2020 that Paul had contributed to Paxton's campaign, that knowledge "did play a part of [appellees'] beliefs—or [Mateer's] belief" that Paxton was engaged in illegal conduct.

Mateer's reluctance or inability to testify as to specific criminal acts that had occurred, given that he was attempting to testify in the face of repeated objections by the OAG that he could not violate various privileges or confidentiality concerns, does not establish that the whistleblowers only reported concerns about prospective, possible violations of the law. Indeed, he testified that he had reported his belief that Paxton and the OAG were violating various laws, "including prohibitions relating to improper influence of use of office, bribery, and other potential criminal offenses," that he had raised his concerns with Paxton, and that Penley and Maxwell had told him that they had concerns about Paxton's "potential unlawful conduct." The fact that Mateer also explained that he had made his report because he had been concerned that continuing down the path directed by Paxton would have led him or the other whistleblowers into knowingly abetting or covering up criminal acts does not require a conclusion that appellees only reported concerns about future criminal acts. Further, Vassar also testified, saying that

23

shortly before October 2020, he and other members of the OAG's senior staff "had concluded that the Office of the Attorney General was being used for the benefit of Mr. Nate Paul in a manner that was likely criminal." He explained that after the August 2019 search of Paul's home and offices, the OAG "became involved in at least five different Nate Paul-related events," listing two of the open records requests, the lawsuit involving the Mitte Foundation, the foreclosure opinion, and Cammack's outside-counsel contract.

We hold that appellees sufficiently alleged that they had reported—based on their good-faith beliefs, observations, and understanding of the law—violations of the law that had occurred and were continuing to occur, not merely speculative, possible future violations of the law. *See McElyea*, 239 S.W.3d at 850 (Act does not require employee to "identify a specific law" or "establish an actual violation of law"); *see also Connally v. Dallas Indep. Sch. Dist.*, 506 S.W.3d 767, 788 (Tex. App.—El Paso 2016, no pet.) ("in most cases involving a charge of Tampering with a Governmental Record, there will be no 'direct evidence' of a defendant's mental state," meaning that proof of culpable mental state almost invariably depends on circumstantial evidence; "knowledge and intent may be inferred from the facts surrounding a defendant's presentation of falsified information on a document submitted for filing as a governmental record"; and report is sufficient under Act if report can support inference that subject of report was "acting with the requisite knowledge and intent when they presented allegedly falsified documents").

### *Did appellees plead a cognizable report of misconduct?*

We now turn to the OAG's argument that appellees "have not adequately alleged that they *each* made a good-faith report of a legal violation." It asserts that "[b]ecause this case

24

involves multiple alleged whistleblowers, each alleged whistleblower must state facts showing that plaintiff individually made a unique, nonpublic, cognizable report," and expresses concerns about "[i]dentical reports by more than one employee," saying that only the first employee's report should fall within the Act because later reports of the same misconduct "add no unique information." Allowing "duplicative reports," the OAG contends, disrupts the "delicate balance drawn" by the legislature. The OAG argues that appellees did not sufficiently plead that each of them provided unique information, noting that "much of the information" was already public.[19]

First, the Act does not include any provisions that would support a conclusion that only one employee may report on misconduct, particularly given appellees' allegations that it was not until they all discussed Paxton's wide-ranging acts of misconduct throughout the large agency that they concluded that he was acting corruptly and misusing his office and public resources to benefit Paul and himself. Indeed, as appellees note, multiple whistleblowers have sought protection under the Act together. *See, e.g.*, *Bates v. Randall County*, 297 S.W.3d 828, 831-32 (Tex. App.—Amarillo 2009, pet. denied); *City of New Braunfels v. Allen*, 132 S.W.3d 157, 159-60 (Tex. App—Austin 2004, no pet.). Nor has the OAG explained how the fact that Maxwell made his report separately to the Texas Rangers but on the same day the other whistleblowers made their report to the FBI somehow should be viewed as taking his report outside the reach of the Act. We hold that appellees adequately pled that they in good

---

[19] Assuming the accuracy of the OAG's assertion that "much of the information" was already public, that statement requires a conclusion that some of the information provided to law enforcement by appellees was not. Moreover, appellees explained in their pleadings that their insider knowledge and their discussions of actions throughout the agency led them to conclude that Paxton was directing the OAG into violating the law. Thus, the pleadings indicate that appellees reported non-public information or conclusions about misconduct that would not be easily reached by the general public.

faith reported to appropriate law-enforcement authorities suspected violations of the law by the OAG and Ken Paxton, as leader of the agency.[20]

**CONCLUSION**

The OAG asserts that Paxton should be able to fire OAG employees if he decides they are not sufficiently loyal or if he has "lost confidence" in them, pointing to the supreme court's observations about the "interests in tension" involved in whistleblower protections and its statement that "the duty of loyalty and other competing legal and ethical principles are powerful arguments in favor of limits" on when whistleblowers should be protected. *See Neighborhood Ctrs. Inc. v. Walker*, 544 S.W.3d 744, 749 (Tex. 2018) (quoting Daniel P. Westman & Nancy M. Modesitt, *Whistleblowing: The Law of Retaliatory Discharge* 41 (Bureau of Nat'l Aff. 2d ed. 2004)). And indeed, Texas is an employment-at-will state, in which employers can terminate employment for virtually any reason. *See, e.g.*, *Texas Farm Bureau Mut. Ins. v. Sears*, 84 S.W.3d 604, 608 (Tex. 2002). However, the Texas Whistleblower Act provides an exception to that general rule—a government employer may not fire an employee who makes a good-faith report of illegal conduct because he made the report. Thus, although loyalty and confidence are important considerations in employment matters, the Act provides that a State employer cannot fire an employee because he reports illegal conduct by the employer, even when it is that act of reporting that causes the employer to lose confidence or feel the employee lacks loyalty.[21] We

---

[20] The OAG also asserts that to the extent appellees rely on their report to the OAG's human resources department, such a report cannot be considered a report to an appropriate law-enforcement authority. However, appellees do not argue that their letter informing the OAG of their reports to law enforcement was their report that falls within the Act.

[21] The Act "does not impose liability against government employers for disliking an employee, or even 'for disliking the employee for reporting illegal conduct,'" and only imposes

hold that appellees alleged facts bringing their lawsuit within the reach of the Act, and we affirm

the trial court's order denying the OAG's rule 91a motion to dismiss.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   October 21, 2021

---

liability if "the employer's dislike for the protected conduct 'played [a] part in the disputed personnel action,'" and the adverse action "occurred 'because' the employee reported a legal violation." *Office of Att'y Gen. v. Rodriguez*, 605 S.W.3d 183, 196 (Tex. 2020) (quoting *Texas Dep't of Hum. Servs. v. Hinds*, 904 S.W.2d 629, 635 (Tex. 1995)).